UNITED STATES ET AL. *v.* MIDWEST VIDEO CORP.

No. 71–506.   Argued April 19, 1972—Decided June 7, 1972

BRENNAN, J., announced the Court's judgment and delivered an opinion in which WHITE, MARSHALL, and BLACKMUN, JJ., joined. BURGER, C. J., filed an opinion concurring in the result, *post*, p. 675. DOUGLAS, J., filed a dissenting opinion, in which STEWART, POWELL, and REHNQUIST, JJ., joined, *post*, p. 677.

*Deputy Solicitor General Wallace* argued the cause for the United States et al. With him on the briefs were *Solicitor General Griswold, Richard B. Stone, John W. Pettit,* and *Edward J. Kuhlmann.*

*Harry M. Plotkin* argued the cause for respondent. With him on the brief were *Wayne W. Owen, George H. Shapiro,* and *David Tillotson.*

Briefs of *amici curiae* urging affirmance were filed by *William J. Scott,* Attorney General, *Peter A. Fasseas,* Special Assistant Attorney General, and *Roland S. Homet, Jr.,* for the State of Illinois; by *Paul Rodgers* for the National Association of Regulatory Utility Commissioners; and by *Melvin L. Wulf* for the American Civil Liberties Union.

MR. JUSTICE BRENNAN announced the judgment of the Court and an opinion in which MR. JUSTICE WHITE, MR. JUSTICE MARSHALL, and MR. JUSTICE BLACKMUN join.

Community antenna television (CATV) was developed long after the enactment of the Communications Act of 1934, 48 Stat. 1064, as amended, 47 U. S. C. § 151 *et seq.,* as an auxiliary to broadcasting through the retransmission by wire of intercepted television signals to viewers otherwise unable to receive them because of distance or local terrain.[1] In *United States* v. *Southwestern Cable Co.,* 392 U. S. 157 (1968), where we sustained the jurisdiction of

---

[1] "CATV systems receive the signals of television broadcasting stations, amplify them, transmit them by cable or microwave, and ultimately distribute them by wire to the receivers of their subscribers." *United States* v. *Southwestern Cable Co.,* 392 U. S. 157, 161 (1968). They "perform either or both of two functions. First, they may supplement broadcasting by facilitating satisfactory reception of local stations in adjacent areas in which such reception would not otherwise be possible; and second, they may transmit to subscribers the signals of distant stations entirely beyond the range of local antennae." *Id.,* at 163.

the Federal Communications Commission to regulate the new industry, at least to the extent "reasonably ancillary to the effective performance of the Commission's various responsibilities for the regulation of television broadcasting," *id.*, at 178, we observed that the growth of CATV since the establishment of the first commercial system in 1950 has been nothing less than " 'explosive.' " *Id.*, at 163.[2] The potential of the new industry to augment communication services now available is equally phenomenal.[3] As we said in *Southwestern, id.*, at 164, CATV "[promises] for the future to provide a national communications system, in which signals from selected broadcasting centers would be transmitted to metropolitan areas throughout the country." Moreover, as the Commission has noted, "the expanding multichannel capacity of cable systems could be utilized to provide a variety of new communications services to homes and businesses within a community," such as facsimile reproduction of documents, electronic mail delivery, and information retrieval. Notice of Proposed Rulemaking and Notice of Inquiry, 15 F. C. C. 2d 417, 419–420 (1968). Perhaps more important, CATV systems can themselves originate programs, or "cablecast"—which means, the Commission has found, that CATV can "[increase] the number of local outlets for community self-expression and [augment] the public's choice of programs and types of service, without use of broadcast spectrum . . . ." *Id.*, at 421.

---

[2] There are now 2,678 CATV systems in operation, 1,916 CATV franchises outstanding for systems not yet in current operation, and 2,804 franchise applications pending. Weekly CATV Activity Addenda, 12 Television Digest 9 (Feb. 28, 1972).

[3] For this reason the Commission has recently adopted the term "cable television" in place of CATV. See Report and Order on Cable Television Service; Cable Television Relay Service, 37 Fed. Reg. 3252 n. 9 (1972) (hereinafter cited as Report and Order on Cable Television Service).

Recognizing this potential, the Commission, shortly after our decision in *Southwestern,* initiated a general inquiry "to explore the broad question of how best to obtain, consistent with the public interest standard of the Communications Act, the full benefits of developing communications technology for the public, with particular immediate reference to CATV technology . . . ." *Id.,* at 417. In particular, the Commission tentatively concluded, as part of a more expansive program for the regulation of CATV,[4] "that, for now and in general, CATV program origination is in the public interest," *id.,* at 421, and sought comments on a proposal "to condition the carriage of television broadcast signals (local or distant) upon a requirement that the CATV system also operate to a significant extent as a local outlet by origi-

---

[4] The early regulatory history of CATV, canvassed in *Southwestern,* need not be repeated here, other than to note that in 1966 the Commission adopted rules, applicable to both microwave and non-microwave CATV systems, to regulate the carriage of local signals, the duplication of local programing, and the importation of distant signals into the 100 largest television markets. See *infra,* at 659. The Commission's 1968 notice of proposed rulemaking addressed, in addition to the program origination requirement at issue here, whether advertising should be permitted on cablecasts and whether the broadcast doctrines of "equal time," "fairness," and sponsorship identification should apply to them. Other areas of inquiry included the use of CATV facilities to provide common carrier service; federal licensing and local regulation of CATV; cross-ownership of television stations and CATV systems; reporting and technical standards; and importation of distant signals into major markets. The notice offered concrete proposals in some of these areas, which were acted on in the Commission's First Report and Order, 20 F. C. C. 2d 201 (1969) (hereinafter cited as First Report and Order), and Report and Order on Cable Television Service. See also Memorandum Opinion and Order, 23 F. C. C. 2d 825 (1970) (hereinafter cited as Memorandum Opinion and Order). None of these regulations, aside from the cablecasting requirement, is now before us, see n. 14, *infra,* and we, of course, intimate no view on their validity.

nating." *Id.,* at 422. As for its authority to impose such a requirement, the Commission stated that its "concern with CATV carriage of broadcast signals is not just a matter of avoidance of adverse effects, but extends also to requiring CATV affirmatively to further statutory policies." *Ibid.*

On the basis of comments received, the Commission on October 24, 1969, adopted a rule providing that "no CATV system having 3,500 or more subscribers shall carry the signal of any television broadcast station unless the system also operates to a significant extent [5] as a local outlet by cablecasting [6] and has available facilities for local production and presentation of programs other

---

[5] "By significant extent [the Commission indicated] we mean something more than the origination of automated services (such as time and weather, news ticker, stock ticker, etc.) and aural services (such as music and announcements). Since one of the purposes of the origination requirement is to insure that cablecasting equipment will be available for use by others originating on common carrier channels, 'operation to a significant extent as a local outlet' in essence necessitates that the CATV operator have some kind of video cablecasting system for the production of local live and delayed programing (e. g., a camera and a video tape recorder, etc.)." First Report and Order 214.

[6] "Cablecasting" was defined as "programing distributed on a CATV system which has been originated by the CATV operator or by another entity, exclusive of broadcast signals carried on the system." 47 CFR § 74.1101 (j). As this definition makes clear, cablecasting may include not only programs produced by the CATV operator, but "films and tapes produced by others, and CATV network programing." First Report and Order 214. See also *id.,* at 203. The definition has been altered to conform to changes in the regulation, see n. 7, *infra,* and now appears at 47 CFR § 76.5 (w). See Report and Order on Cable Television Service 3279. Although the definition now refers to programing "subject to the exclusive control of the cable operator," this is apparently not meant to effect a change in substance or to preclude the operator from cablecasting programs produced by others. See *id.,* at 3271.

than automated services." 47 CFR § 74.1111 (a).[7] In a report accompanying this regulation, the Commission stated that the tentative conclusions of its earlier notice of proposed rulemaking

"recognize the great potential of the cable technology to further the achievement of long-established regulatory goals in the field of television broadcasting by increasing the number of outlets for community self-expression and augmenting the public's choice of programs and types of services . . . . They also reflect our view that a multi-purpose CATV operation combining carriage of broadcast signals with program origination and common carrier services,[8] might best exploit cable channel capacity to the advantage of the public and promote the basic purpose for which this Commission was created: 'regulating interstate and foreign commerce in com-

---

[7] This requirement, applicable to both microwave and non-microwave CATV systems without any "grandfathering" provision, was originally scheduled to go into effect on January 1, 1971. See First Report and Order 223. On petitions for reconsideration, however, the effective date was delayed until April 1, 1971, see Memorandum Opinion and Order 827, 830, and then, after the Court of Appeals decision below, suspended pending final judgment here. See 36 Fed. Reg. 10876 (1971). Meanwhile, the regulation has been revised and now appears at 47 CFR § 76.201 (a). The revision has no significance for this case. See Memorandum Opinion and Order 827, 830 (revision effective Aug. 14, 1970); Report and Order on Cable Television Service 3271, 3277, 3287 (revision effective Mar. 31, 1972).

[8] Although the Commission did not impose common-carrier obligations on CATV systems in its 1969 report, it did note that "the origination requirement will help ensure that origination facilities are available for use by others originating on leased channels." First Report and Order 209. Public access requirements were introduced in the Commission's Report and Order on Cable Television Service, although not directly under the heading of common-carrier service. See id., at 3277.

munication by wire and radio so as to make available, so far as possible, to all people of the United States a rapid, efficient, nationwide, and worldwide wire and radio communication service with adequate facilities at reasonable charges . . .' (sec. 1 of the Communications Act).[9] After full consideration of the comments filed by the parties, we adhere to the view that program origination on CATV is in the public interest." [10] First Report and Order, 20 F. C. C. 2d 201, 202 (1969).

---

[9] Section 1 of the Act, 48 Stat. 1064, as amended, 47 U. S. C. § 151, states:

"For the purpose of regulating interstate and foreign commerce in communication by wire and radio so as to make available, so far as possible, to all the people of the United States a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges, for the purpose of the national defense, for the purpose of promoting safety of life and property through the use of wire and radio communication, and for the purpose of securing a more effective execution of this policy by centralizing authority heretofore granted by law to several agencies and by granting additional authority with respect to interstate and foreign commerce in wire and radio communication, there is created a commission to be known as the 'Federal Communications Commission,' which shall be constituted as hereinafter provided, and which shall execute and enforce the provisions of this chapter."

[10] In so concluding, the Commission rejected the contention that a prohibition on CATV originations was "necessary to prevent potential fractionalization of the audience for broadcast services and a siphoning off of program material and advertising revenue now available to the broadcast service." First Report and Order 202. "[B]roadcasters and CATV originators . . . ," the Commission reasoned, "stand on the same footing in acquiring the program material with which they compete." *Id.*, at 203. Moreover, "a loss of audience or advertising revenue to a television station is not in itself a matter of moment to the public interest unless the result is a net loss of television service," *ibid.*—an impact that the Commission found had no support in the record and that, in any event, it

The Commission further stated, *id.*, at 208–209:

"The use of broadcast signals has enabled CATV to finance the construction of high capacity cable facilities. In requiring in return for these uses of radio that CATV devote a portion of the facilities to providing needed origination service, we are furthering our statutory responsibility to 'encourage the larger and more effective use of radio in the public interest' (sec. 303 (g)).[11] The requirement will also facilitate the more effective performance of the Commission's duty to provide a fair, efficient, and equitable distribution of television service to each of the several States and communities (sec. 307 (b)),[12] in areas where we have been unable to accomplish this through broadcast media." [13]

would undertake to prevent should the need arise. See *id.*, at 203–204. See also Memorandum Opinion and Order 826 n. 3, 828–829.

[11] Section 303 (g), 48 Stat. 1082, 47 U. S. C. § 303, states that "[e]xcept as otherwise provided in this chapter, the Commission from time to time, as public convenience, interest, or necessity requires, shall" "(g) [s]tudy new uses for radio, provide for experimental uses of frequencies, and generally encourage the larger and more effective use of radio in the public interest . . . ."

[12] Section 307 (b), 48 Stat. 1084, as amended, 47 U. S. C. § 307 (b), states:

"In considering applications for licenses [for the transmission of energy, communications, or signals by radio], and modifications and renewals thereof, when and insofar as there is demand for the same, the Commission shall make such distribution of licenses, frequencies, hours of operation, and of power among the several States and communities as to provide a fair, efficient, and equitable distribution of radio service to each of the same."

[13] The Commission added: "[I]n authorizing the receipt, forwarding, and delivery of broadcast signals, the Commission is in effect authorizing CATV to engage in radio communication, and may condition this authorization upon reasonable requirements governing activities which are closely related to such radio communication and facilities." First Report and Order 209 (citing, *inter alia*,

Upon the challenge of respondent Midwest Video Corp., an operator of CATV systems subject to the new cablecasting requirement, the United States Court of Appeals for the Eighth Circuit set aside the regulation on the ground that the Commission "is without authority to impose" it. 441 F. 2d 1322, 1328 (1971).[14] "The Commission's power [over CATV] . . . ," the court explained, "must be based on the Commission's right to adopt rules that are reasonably ancillary to its responsi-

§ 301 of the Communications Act, 48 Stat. 1081, 47 U. S. C. § 301 (generally requiring licenses for the use or operation of any apparatus for the interstate or foreign transmission of energy, communications, or signals by radio)). Since, as we hold, *infra*, the authority of the Commission recognized in *Southwestern* is sufficient to sustain the cablecasting requirement at issue here, we need not, and do not, pass upon the extent of the Commission's jurisdiction over CATV under § 301. See, *e. g., FCC* v. *Pottsville Broadcasting Co.*, 309 U. S. 134, 138 (1940); *General Telephone Co. of Cal.* v. *FCC*, 134 U. S. App. D. C. 116, 130–131, 413 F. 2d 390, 404–405 (1969); *Philadelphia Television Broadcasting Co.* v. *FCC*, 123 U. S. App. D. C. 298, 300, 359 F. 2d 282, 284 (1966):

"In a statutory scheme in which Congress has given an agency various bases of jurisdiction and various tools with which to protect the public interest, the agency is entitled to some leeway in choosing which jurisdictional base and which regulatory tools will be most effective in advancing the Congressional objective."

[14] Although this holding was specifically limited to "existing cable television operators," the court's reasoning extended more broadly to all CATV systems, and, indeed, its judgment set aside the regulation in all its applications. See 441 F. 2d, at 1328.

Respondent also challenged other regulations, promulgated in the Commission's First Report and Order and Memorandum Opinion and Order, dealing with advertising, "equal time," "fairness," sponsorship identification, and per-program or per-channel charges on cablecasts. The Court of Appeals, however, did not "[pass] on the power of the FCC . . . to prescribe reasonable rules for such CATV operators who voluntarily choose to originate programs," *id.*, at 1326, since respondent acknowledged that it did not want to cablecast and hence lacked standing to attack those rules. See *id.*, at 1328.

bilities in the broadcasting field," *id.*, at 1326—a standard that the court thought the Commission's regulation "goes far beyond." *Id.*, at 1327.[15] The court's opinion may also be understood to hold the regulation invalid as not supported by substantial evidence that it would serve the public interest. "The Commission report itself shows," the court said, "that upon the basis of the record made, it is·highly speculative whether there is sufficient expertise or information available to support a finding that the origination rule will further the public interest." *Id.*, at 1328. "Entering into the program origination field involves very substantial expenditures," *id.*, at 1327, and "[a] high probability exists that cablecasting will not be self-supporting," that there will be a "substantial increase" in CATV subscription fees, and that "in some instances" CATV operators will be driven out of business. *Ibid.*[16] We granted certiorari. 404 U. S. 1014 (1972). We reverse.

---

[15] The court held, in addition, that the Commission may not require CATV operators "as a condition to [their] right to use . . . captured [broadcast] signals in their existing franchise operation to engage in the entirely new and different business of originating programs." *Id.*, at 1327. This holding presents no separate question from the "reasonably ancillary" issue that need be considered here. See n. 22, *infra.*

[16] Concurring in the result in a similar vein, Judge Gibson concluded that although "the FCC has authority over CATV systems," "the order under review is confiscatory and hence arbitrary," 441 F. 2d, at 1328, for the regulation "would be extremely burdensome and perhaps remove from the CATV field many entreprencurs who do not have the resources, talent and ability to enter the broadcasting field." *Id.*, at 1329. If this is to suggest that the regulation is invalid merely because it burdens CATV operators or may even force some of them out of business, the argument is plainly incorrect. See n. 31, *infra.* The question would still remain whether the Commission reasonably found on substantial evidence that the regulation on balance would promote policy objectives committed to its jurisdiction under the Communications Act, which, for the reasons given *infra,* we hold that it did.

## I

In 1966 the Commission promulgated regulations that, in general, required CATV systems (1) to carry, upon request and in a specified order of priority within the limits of their channel capacity, the signals of broadcast stations into whose service area they brought competing signals; (2) to avoid, upon request, the duplication on the same day of local station programing; and (3) to refrain from bringing new distant signals into the 100 largest television markets except upon a prior showing that that service would be consistent with the public interest. See Second Report and Order, 2 F. C. C. 2d 725 (1966). In assessing the Commission's jurisdiction over CATV against the backdrop of these regulations,[17] we focused in *Southwestern* chiefly on § 2 (a) of the Communications Act, 48 Stat. 1064, as amended, 47 U. S. C. § 152 (a), which provides in pertinent part: "The provisions of this [Act] shall apply to all interstate and foreign communication by wire or radio . . . , which originates and/or is received within the United States, and to all persons engaged within the United States in such communication . . . ." In view of the Act's definitions of "communication by wire" and "communication by radio," [18] the interstate character of CATV services,[19]

---

[17] *Southwestern* reviewed, but did not specifically pass upon the validity of, the regulations. See 392 U. S., at 167. Their validity was, however, subsequently and correctly upheld by courts of appeals as within the guidelines of that decision. See, *e. g., Black Hills Video Corp.* v. *FCC*, 399 F. 2d 65 (CA8 1968).

[18] Sections 3 (a), (b), 48 Stat. 1065, 47 U. S. C. §§ 153 (a), (b), define these terms to mean "the transmission" "of writing, signs, signals, pictures, and sounds of all kinds," whether by cable or radio, "including all instrumentalities, facilities, apparatus, and services (among other things, the receipt, forwarding, and delivery of communications) incidental to such transmission."

[19] "Nor can we doubt that CATV systems are engaged in interstate communication, even where . . . the intercepted signals ema-

and the evidence of congressional intent that "[t]he Commission was expected to serve as the 'single Government agency' with 'unified jurisdiction' and 'regulatory power over all forms of electrical communication, whether by telephone, telegraph, cable, or radio,' " 392 U. S., at 167–168 (footnotes omitted), we held that § 2 (a) amply covers CATV systems and operations. We also held that § 2 (a) is itself a grant of regulatory power and not merely a prescription of the forms of communication to which the Act's other provisions governing common carriers and broadcasters apply:

> "We cannot [we said] construe the Act so restrictively. Nothing in the language of § [2 (a)], in the surrounding language, or in the Act's history or purposes limits the Commission's authority to those activities and forms of communication that are specifically described by the Act's other provisions. . . . Certainly Congress could not in 1934 have foreseen the development of community antenna television systems, but it seems to us that it was precisely because Congress wished 'to maintain, through appropriate administrative control, a grip on the dynamic aspects of radio transmission,' *F. C. C.* v. *Pottsville Broadcasting Co.*, [309 U. S.],

nate from stations located within the same State in which the CATV system operates. We may take notice that television broadcasting consists in very large part of programming devised for, and distributed to, national audiences; [CATV operators] thus are ordinarily employed in the simultaneous retransmission of communications that have very often originated in other States. The stream of communication is essentially uninterrupted and properly indivisible. To categorize [CATV] activities as intrastate would disregard the character of the television industry, and serve merely to prevent the national regulation that 'is not only appropriate but essential to the efficient use of radio facilities.' *Federal Radio Comm'n* v. *Nelson Bros. Co.*, 289 U. S. 266, 279." 392 U. S., at 168–169.

at 138, that it conferred upon the Commission a 'unified jurisdiction' and 'broad authority.' Thus, '[u]nderlying the whole [Communications Act] is recognition of the rapidly fluctuating factors characteristic of the evolution of broadcasting and of the corresponding requirement that the administrative process possess sufficient flexibility to adjust itself to these factors.' [*Ibid.*] Congress in 1934 acted in a field that was demonstrably 'both new and dynamic,' and it therefore gave the Commission 'a comprehensive mandate,' with 'not niggardly but expansive powers.' *National Broadcasting Co.* v. *United States,* 319 U. S. 190, 219. We have found no reason to believe that § [2] does not, as its terms suggest, confer regulatory authority over 'all interstate . . . communication by wire or radio.' " *Id.,* at 172–173 (footnotes omitted).

This conclusion, however, did not end the analysis, for § 2 (a) does not in and of itself prescribe any objectives for which the Commission's regulatory power over CATV might properly be exercised. We accordingly went on to evaluate the reasons for which the Commission had asserted jurisdiction and found that "the Commission has reasonably concluded that regulatory authority over CATV is imperative if it is to perform with appropriate effectiveness certain of its other responsibilities." *Id.,* at 173. In particular, we found that the Commission had reasonably determined that " 'the unregulated explosive growth of CATV,' " especially through "its importation of distant signals into the service areas of local stations" and the resulting division of audiences and revenues, threatened to "deprive the public of the various benefits of [the] system of local broadcasting stations" that the Commission was charged with developing and overseeing under § 307 (b) of the

Act.[20] *Id.,* at 175. We therefore concluded, without expressing any view "as to the Commission's authority, if any, to regulate CATV under any other circumstances or for any other purposes," that the Commission does have jurisdiction over CATV "reasonably ancillary to the effective performance of [its] various responsibilities for the regulation of television broadcasting . . . [and] may, for these purposes, issue 'such rules and regulations and prescribe such restrictions and conditions, not inconsistent with law,' as 'public convenience, interest, or necessity requires.'" *Id.,* at 178 (quoting § 303 (r) of the Act, 50 Stat. 191, 47 U. S. C. § 303 (r)).

The parties now before us do not dispute that in light of *Southwestern* CATV transmissions are subject to the Commission's jurisdiction as "interstate . . . communication by wire or radio" within the meaning of § 2 (a) even insofar as they are local cablecasts.[21] The contro-

---

[20] See n. 12, *supra.* See also §§ 303 (f), (h), 48 Stat. 1082, 47 U. S. C. §§ 303 (f), (h) (authorizing the Commission to prevent interference among stations and to establish areas to be served by them respectively). "In particular, the Commission feared that CATV might . . . significantly magnify the characteristically serious financial difficulties of UHF and educational television broadcasters." 392 U. S., at 175–176.

[21] This, however, is contested by the State of Illinois as *amicus curiae.* It is, nevertheless, clear that cablecasts constitute communication by wire (or radio if microwave transmission is involved), as well as interstate communication if the transmission itself has moved interstate, as the Commission has authorized and encouraged. See First Report and Order 207–208 (regional and national interconnections) and n. 6, *supra.* The capacity for interstate nonbroadcast programing may in itself be sufficient to bring cablecasts within the compass of § 2 (a). In *Southwestern* we declined to carve CATV broadcast transmissions, for the purpose of determining the extent of the Commission's regulatory authority, into interstate and intrastate components. See n. 19, *supra.* This result was justified by the extent of interstate broadcast programing, the interdependencies between the two components, and the need to preserve the " 'unified and comprehensive regulatory system

versy, instead, centers on whether the Commission's program-origination rule is "reasonably ancillary to the effective performance of [its] various responsibilities for the regulation of television broadcasting." [22]   We hold that it is.

for the [broadcasting] industry.'" 392 U. S., at 168 (quoting *FCC* v. *Pottsville Broadcasting Co.*, n. 13, *supra*, at 137). A similar rationale may apply here, despite the lesser "interstate content" of cablecasts at present.

But we need not now decide that question because, in any event, CATV operators have, by virtue of their carriage of broadcast signals, necessarily subjected themselves to the Commission's comprehensive jurisdiction. As MR. CHIEF JUSTICE (then Judge) BURGER has stated in a related context:

"The Petitioners [telephone companies providing CATV channel distribution facilities] have, by choice, inserted themselves as links in this indivisible stream and have become an integral part of interstate broadcast transmission.  They cannot have the economic benefits of such carriage as they perform and be free of the necessarily pervasive jurisdiction of the Commission." *General Telephone Co. of Cal.* v. *FCC*, n. 13, *supra*, at 127, 413 F. 2d, at 401.

The devotion of CATV systems to broadcast transmission—together with the interdependencies between that service and cablecasts, and the necessity for unified regulation—plainly suffices to bring cablecasts within the Commission's § 2 (a) jurisdiction.  See generally Barnett, State, Federal, and Local Regulation of Cable Television, 47 Notre Dame Law. 685, 721–723, 726–734 (1972).

[22] Since "[t]he function of CATV systems has little in common with the function of broadcasters," *Fortnightly Corp.* v. *United Artists Television*, 392 U. S. 390, 400 (1968), and since "[t]he fact that . . . property is devoted to a public use on certain terms does not justify . . . the imposition of restrictions that are not reasonably concerned with the proper conduct of the business according to the undertaking which the [owner] has expressly or impliedly assumed," *Northern Pacific R. Co.* v. *North Dakota*, 236 U. S. 585, 595 (1915), respondent also argues that CATV operators may not be required to cablecast as a condition for their customary service of carrying broadcast signals.  This conclusion might follow only if the program-origination requirement is not reasonably ancillary to the Commission's jurisdiction over broadcasting.  For, as we held in *Southwestern*, CATV operators *are*, at least to that

At the outset we must note that the Commission's legitimate concern in the regulation of CATV is not limited to controlling the competitive impact CATV may have on broadcast services. *Southwestern* refers to the Commission's "various responsibilities for the regulation of television broadcasting." These are considerably more numerous than simply assuring that broadcast stations operating in the public interest do not go out of business. Moreover, we must agree with the Commission that its "concern with CATV carriage of broadcast signals is not just a matter of avoidance of adverse effects, but extends also to requiring CATV affirmatively to further statutory policies." *Supra,* at 653. Since the avoidance of adverse effects is itself the furtherance of statutory policies, no sensible distinction even in theory can be drawn along those lines. More important, CATV systems, no less than broadcast stations, see, *e. g., Federal Radio Comm'n* v. *Nelson Bros. Co.,* 289 U. S. 266 (1933) (deletion of a station), may enhance as well as impair the appropriate

---

extent, engaged in a business subject to the Commission's regulation. Our holding on the "reasonably ancillary" issue is therefore dispositive of respondent's additional claim. See *infra,* at 669–670.

It should be added that *Fortnightly Corp.* v. *United Artists Television, supra,* has no bearing on the "reasonably ancillary" question. That case merely held that CATV operators who retransmit, but do not themselves originate copyrighted works do not "perform" them within the meaning of the Copyright Act, 61 Stat. 652, as amended, 17 U. S. C. § 1, since "[e]ssentially, [that kind of] a CATV system no more than enhances the viewer's capacity to receive the broadcaster's signals . . . ." 392 U. S., at 399. The analogy thus drawn between CATV operations and broadcast viewing for copyright purposes obviously does not dictate the extent of the Commission's authority to regulate CATV under the Communications Act. Indeed, *Southwestern,* handed down only a week before *Fortnightly,* expressly held that CATV systems are not merely receivers, but transmitters of interstate communication subject to the Commission's jurisdiction under that Act. See 392 U. S., at 168.

provision of broadcast services. Consequently, to define the Commission's power in terms of the protection, as opposed to the advancement, of broadcasting objectives would artificially constrict the Commission in the achievement of its statutory purposes and be inconsistent with our recognition in *Southwestern* "that it was precisely because Congress wished 'to maintain, through appropriate administrative control, a grip on the dynamic aspects of radio transmission,' . . . that it conferred upon the Commission a 'unified jurisdiction' and 'broad authority.' " *Supra,* at 660–661.[23]

The very regulations that formed the backdrop for our decision in *Southwestern* demonstrate this point. Those regulations were, of course, avowedly designed to guard broadcast services from being undermined by unregulated CATV growth. At the same time, the Commission recognized that "CATV systems . . . have arisen in response to public need and demand for improved television service and perform valuable public services in this respect." Second Report and Order, 2 F. C. C. 2d 725, 745 (1966).[24] Accordingly, the Commission's express purpose was not

> "to deprive the public of these important benefits or to restrict the enriched programing selection which

---

[23] See also *General Telephone Co. of Cal.* v. *FCC,* n. 13, *supra,* at 124, 413 F. 2d, at 398:

"Over the years, the Commission has been required to meet new problems concerning CATV and as cases have reached the courts the scope of the Act has been defined, as Congress contemplated would be done, so as to avoid a continuing process of statutory revision. To do otherwise in regulating a dynamic public service function such as broadcasting would place an intolerable regulatory burden on the Congress—one which it sought to escape by delegating administrative functions to the Commission."

[24] The Commission elaborated:

"CATV . . . has made a significant contribution to meeting the public demand for television service in areas too small in popula-

CATV makes available. Rather, our goal here is to integrate the CATV service into the national television structure in such a way as to promote maximum television service to all people of the United States (secs. 1 and 303 (g) of the act [nn. 9 and 11, *supra*]), both those who are cable viewers and those dependent on off-the-air service. The new rules . . . are the minimum measures we believe to be essential to insure that CATV continues to perform its valuable supplementary role without unduly damaging or impeding the growth of television broadcast service." *Id.*, at 745–746.[25]

In implementation of this approach CATV systems were required to carry local broadcast station signals to encourage diversified programing suitable to the community's needs as well as to prevent a diversion of audiences and advertising revenues.[26] The duplication of

---

tion to support a local station or too remote in distance or isolated by terrain to receive regular or good off-the-air reception. It has also contributed to meeting the public's demand for good reception of multiple program choices, particularly the three full network services. In thus contributing to the realization of some of the most important goals which have governed our allocations planning, CATV has clearly served the public interest 'in the larger and more effective use of radio.' And, even in the major market, where there may be no dearth of service . . . , CATV may . . . increase viewing opportunities, either by bringing in programing not otherwise available or, what is more likely, bringing in programing locally available but at times different from those presented by the local stations." Second Report and Order, 2 F. C. C. 2d 725, 781 (1966). See also *id.*, at 745.

[25] This statement, made with reference only to the local carriage and non-duplication requirements, was no less true of the distant importation rule. See *id.*, at 781–782.

[26] The regulation, for example, retained the provision of the Commission's earlier rule governing CATV microwave systems under which a local signal was not required to be carried "if (1) it substantially duplicates the network programing of a signal of a higher grade, and (2) carrying it would—because of limited channel capac-

local station programing was also forbidden for the latter purpose, but only on the same day as the local broadcast so as "to preserve, to the extent practicable, the valuable public contribution of CATV in providing wider access to nationwide programing and a wider selection of programs on any particular day." *Id.*, at 747. Finally, the distant-importation rule was adopted to enable the Commission to reach a public-interest determination weighing the advantages and disadvantages of the proposed service on the facts of each individual case. See *id.*, at 776, 781–782. In short, the regulatory authority asserted by the Commission in 1966 and generally sustained by this Court in *Southwestern* was authority to regulate CATV with a view not merely to protect but to promote the objectives for which the Commission had been assigned jurisdiction over broadcasting.

In this light the critical question in this case is whether the Commission has reasonably determined that its origination rule will "further the achievement of long-estab-

ity—prevent the system from carrying a nonnetwork signal, which would contribute to the diversity of its service." First Report and Order, 38 F. C. C. 683, 717 (1965). See Second Report and Order, n. 24, *supra*, at 752–753. Moreover, CATV operators were warned that, in reviewing their discretionary choice of stations to carry among those of equal priority in certain circumstances, the Commission would "give particular consideration to any allegation that the station not carried is one with closer community ties." *Id.*, at 755. In addition, operators were required to carry the signals of local satellite stations even if they also carried the signals of the satellites' parents; otherwise, "the satellite [might] lose audience for which it may be originating some local programing and [find] its incentive to originate programs [reduced]." *Id.*, at 755–756. Finally, the Commission indicated that, in considering waivers of the regulation, it would "[accord] substantial weight" to such considerations as whether "the programing of stations located within the State would be of greater interest than those of nearer, but out-of-State stations [otherwise required to be given priority in carriage]—e. g., coverage of political elections and other public affairs of statewide concern." *Id.*, at 753.

lished regulatory goals in the field of television broadcasting by increasing the number of outlets for community self-expression and augmenting the public's choice of programs and types of services . . . ." *Supra,* at 654. We find that it has.

The goals specified are plainly within the Commission's mandate for the regulation of television broadcasting.[27] In *National Broadcasting Co.* v. *United States,* 319 U. S. 190 (1943), for example, we sustained Commission regulations governing relations between broadcast stations and network organizations for the purpose of preserving the stations' ability to serve the public interest through their programing. Noting that "[t]he facilities of radio are not large enough to accommodate all who wish to use them," *id.,* at 216, we held that the Communications "Act does not restrict the Commission merely to supervision of [radio] traffic. It puts upon the Commission the burden of determining the composition of that traffic." *Id.,* at 215–216. We then upheld the Commission's judgment that

> " '[w]ith the number of radio channels limited by natural factors, the public interest demands that those who are entrusted with the available channels shall make the fullest and most effective use of them.' " *Id.,* at 218.

> " 'A station licensee must retain sufficient freedom of action to supply the program . . . needs of the local community. Local program service is a vital part of community life. A station should be ready,

---

[27] As the Commission stated, "it has long been a basic tenet of national communications policy that 'the widest possible dissemination of information from diverse and antagonistic sources is essential to the welfare of the public.' *Associated Press* v. *United States,* 326 U. S. 1, 20; *Red Lion Broadcasting Co., Inc.* v. *Federal Communications Commission,* 395 U. S. 367 . . . ." First Report and Order 205.

able, and willing to serve the needs of the local community by broadcasting such outstanding local events as community concerts, civic meetings, local sports events, and other programs of local consumer and social interest.' "  *Id.,* at 203.

Equally plainly the broadcasting policies the Commission has specified are served by the program-origination rule under review. To be sure, the cablecasts required may be transmitted without use of the broadcast spectrum. But the regulation is not the less, for that reason, reasonably ancillary to the Commission's jurisdiction over broadcast services. The effect of the regulation, after all, is to assure that in the retransmission of broadcast signals viewers are provided suitably diversified programing—the same objective underlying regulations sustained in *National Broadcasting Co.* v. *United States, supra,* as well as the local-carriage rule reviewed in *Southwestern* and subsequently upheld. See *supra,* at 666 and nn. 17 and 26, *supra.* In essence the regulation is no different from Commission rules governing the technological quality of CATV broadcast carriage. In the one case, of course, the concern is with the strength of the picture and voice received by the subscriber, while in the other it is with the content of the programing offered. But in both cases the rules serve the policies of §§ 1 and 303 (g) of the Communications Act on which the cablecasting regulation is specifically premised, see *supra,* at 654–656,[28] and also, in the Commission's words,

---

[28] Respondent apparently does not dispute this, but contends instead that §§ 1 and 303 (g) merely state objectives without granting power for their implementation. See Brief for Midwest Video Corp. 24. The cablecasting requirement, however, is founded on those provisions for the policies they state and not for any regulatory power they might confer. The regulatory power itself may be found, as in *Southwestern,* see *supra,* at 660, 662, in 47 U. S. C. §§ 152 (a), 303 (r).

"facilitate the more effective performance of [its] duty to provide a fair, efficient, and equitable distribution of television service to each of the several States and communities" under § 307 (b). *Supra,* at 656.[29] In sum, the regulation preserves and enhances the integrity of broadcast signals and therefore is "reasonably ancillary to the effective performance of the Commission's various responsibilities for the regulation of television broadcasting."

Respondent, nevertheless, maintains that just as the Commission is powerless to require the provision of television broadcast services where there are no applicants for station licenses no matter how important or desirable those services may be, so, too, it cannot require CATV operators unwillingly to engage in cablecasting. In our view, the analogy respondent thus draws between entry into broadcasting and entry into cablecasting is misconceived. The Commission is not attempting to compel wire service where there has been no commitment to undertake it. CATV operators to whom the cablecasting rule applies have voluntarily engaged themselves in providing that service, and the Commission seeks only to ensure that it satisfactorily meets community needs within the context of their undertaking.

For these reasons we conclude that the program-origination rule is within the Commission's authority recognized in *Southwestern.*

---

[29] Respondent asserts that "it is difficult to see how a mandatory [origination] requirement . . . can be said to aid the Commission in preserving the availability of broadcast stations to the several states and communities." Brief for Midwest Video Corp. 24. Respondent ignores that the provision of additional programing outlets by CATV necessarily affects the fairness, efficiency, and equity of the distribution of television services. We have no basis, it may be added, for overturning the Commission's judgment that the effect in this regard will be favorable. See *supra,* at 654–655 and n. 10.

## II

The question remains whether the regulation is supported by substantial evidence that it will promote the public interest. We read the opinion of the Court of Appeals as holding that substantial evidence to that effect is lacking because the regulation creates the risk that the added burden of cablecasting will result in increased subscription rates and even the termination of CATV services. That holding is patently incorrect in light of the record.

In first proposing the cablecasting requirement, the Commission noted that "[t]here may . . . be practical limitations [for compliance] stemming from the size of some CATV systems" and accordingly sought comments "as to a reasonable cutoff point [for application of the regulation] in light of the cost of the equipment and personnel minimally necessary for local originations." Notice of Proposed Rulemaking and Notice of Inquiry, 15 F. C. C. 2d 417, 422 (1968). The comments filed in response to this request included detailed data indicating, for example, that a basic monochrome system for cablecasting could be obtained and operated for less than an annual cost of $21,000 and a color system, for less than $56,000. See First Report and Order 210. This information, however, provided only a sampling of the experience of the CATV systems already engaged in program origination. Consequently, the Commission

"decided not to prescribe a permanent minimum cutoff point for required origination on the basis of the record now before us. The Commission intends to obtain more information from originating systems about their experience, equipment, and the nature of the origination effort. . . . In the meantime, we

will prescribe a very liberal standard for required origination, with a view toward lowering this floor in . . . further proceedings, should the data obtained in such proceedings establish the appropriateness and desirability of such action." *Id.*, at 213.

On this basis the Commission chose to apply the regulation to systems with 3,500 or more subscribers, effective January 1, 1971.

"This standard [the Commission explained] appears more than reasonable in light of the [data filed], our decision to permit advertising at natural breaks . . . , and the 1-year grace period. Moreover, it appears that approximately 70 percent of the systems now originating have fewer than 3,500 subscribers; indeed, about half of the systems now originating have fewer than 2,000 subscribers. . . . [T]he 3,500 standard will encompass only a very small percentage of existing systems at present subscriber levels, less than 10 percent." *Ibid.*

On petitions for reconsideration the Commission observed that it had "been given no data tending to demonstrate that systems with 3,500 subscribers cannot cablecast without impairing their financial stability, raising rates or reducing the quality of service." Memorandum Opinion and Order 826. The Commission repeated that "[t]he rule adopted is minimal in the light of the potentials of cablecasting,"[30] but, nonetheless, on its own motion postponed the effective date of the regulation to April 1, 1971, "to afford additional preparation time." *Id.*, at 827.

This was still not the Commission's final effort to tailor the regulation to the financial capacity of CATV oper-

---

[30] Commissioner Bartley, however, dissented on the ground that the regulation should apply only to systems with over 7,500 subscribers. Memorandum Opinion and Order 831.

ators. In denying respondent's motion for a stay of the effective date of the rule, the Commission reiterated that "there has been no showing made to support the view that compliance . .·. would be an unsustainable burden." Memorandum Opinion and Order, 27 F. C. C. 2d 778, 779 (1971). On the other hand, the Commission recognized that new information suggested that CATV systems of 10,000 ultimate subscribers would operate at a loss for at least four years if required to cablecast. That information, however, was based on capital expenditure and annual operating cost figures "appreciably higher" than those first projected by the Commission. *Ibid.* The Commission concluded:

> "While we do not consider that an adequate showing has been made to justify general change, we see no public benefit in risking injury to CATV systems in providing local origination. Accordingly, if CATV operators with fewer than 10,000 subscribers request *ad hoc* waiver of [the regulation], they will not be required to originate pending action on their waiver requests. . . . Systems of more than 10,000 subscribers may also request waivers, but they will not be excused from compliance unless the Commission grants a requested waiver . . . . [The] benefit [of cablecasting] to the public would be delayed if the . . . stay [requested by respondent] is granted, and the stay would, therefore, do injury to the public's interest." *Ibid.*

This history speaks for itself. The cablecasting requirement thus applied is plainly supported by substantial evidence that it will promote the public interest.[31] Indeed, respondent does not appear to argue

---

[31] Nor is the regulation infirm for its failure to grant "grandfather" rights, see n. 7, *supra,* as the Commission warned would be the case in its Notice of Proposed Rulemaking and Notice of

to the contrary. See Tr. of Oral Arg. 43–44. It was, of course, beyond the competence of the Court of Appeals itself to assess the relative risks and benefits of cablecasting. As we said in *National Broadcasting Co.* v. *United States,* 319 U. S., at 224:

"Our duty is at an end when we find that the action of the Commission was based upon findings supported by evidence, and was made pursuant to authority granted by Congress. It is not for us to

---

Inquiry, 15 F. C. C. 2d 417, 424 (1968). See, *e. g., Federal Radio Comm'n* v. *Nelson Bros. Co.,* 289 U. S. 266, 282 (1933) ("the power of Congress in the regulation of interstate commerce is not fettered by the necessity of maintaining existing arrangements which would conflict with the execution of its policy"). Judge Tuttle has elaborated, *General Telephone Co. of Southwest* v. *United States,* 449 F. 2d 846, 863–864 (CA5 1971):

"In a complex and dynamic industry such as the communications field, it cannot be expected that the agency charged with its regulation will have perfect clairvoyance. Indeed as Justice Cardozo once said, 'Hardship must at times result from postponement of the rule of action till a time when action is complete. It is one of the consequences of the limitations of the human intellect and of the denial to legislators and judges of infinite prevision.' Cardozo, The Nature of the Judicial Process 145 (1921). The Commission, thus, must be afforded some leeway in developing policies and rules to fit the exigencies of the burgeoning CATV industry. Where the on-rushing course of events [has] outpaced the regulatory process, the Commission should be enabled to remedy the [problem] . . . by retroactive adjustments, provided they are reasonable. . . .

"Admittedly the rule here at issue has an effect on activities embarked upon prior to the issuance of the Commission's Final Order and Report. Nonetheless the announcement of a new policy will inevitably have retroactive consequences. . . . The property of regulated industries is held subject to such limitations as may reasonably be imposed upon it in the public interest and the courts have frequently recognized that new rules may abolish or modify pre-existing interests."

With regard to federal infringement of franchise rights, see generally Barnett, n. 21, *supra,* at 703–705 and n. 116.

say that the 'public interest' will [in fact] be furthered or retarded by the . . . [regulation]."

See also, e. g., *United States* v. *Storer Broadcasting Co.*, 351 U. S. 192, 203 (1956); *General Telephone Co. of Southwest* v. *United States*, 449 F. 2d 846, 858–859, 862–863 (CA5 1971).

*Reversed.*

MR. CHIEF JUSTICE BURGER, concurring in the result.

This case presents questions of extraordinary difficulty and sensitivity in the communications field, as the opinions of the divided Court of Appeals and our own divisions reflect. As MR. JUSTICE BRENNAN has noted, Congress could not anticipate the advent of CATV when it enacted the regulatory scheme nearly 40 years ago. Yet that statutory scheme plainly anticipated the need for comprehensive regulation as pervasive as the reach of the instrumentalities of broadcasting.

In the four decades spanning the life of the Communications Act, the courts have consistently construed the Act as granting pervasive jurisdiction to the Commission to meet the expansion and development of broadcasting. That approach was broad enough to embrace the advent of CATV, as indicated in the plurality opinion. CATV is dependent totally on broadcast signals and is a significant link in the system as a whole and therefore must be seen as within the jurisdiction of the Act.

Concededly, the Communications Act did not explicitly contemplate either CATV or the jurisdiction the Commission has now asserted. However, Congress was well aware in the 1930's that broadcasting was a dynamic instrumentality, that its future could not be predicted, that scientific developments would inevitably enlarge the role and scope of broadcasting, and that, in consequence,

regulatory schemes must be flexible and virtually open-ended.

Candor requires acknowledgment, for me at least, that the Commission's position strains the outer limits of even the open-ended and pervasive jurisdiction that has evolved by decisions of the Commission and the courts. The almost explosive development of CATV suggests the need of a comprehensive re-examination of the statutory scheme as it relates to this new development, so that the basic policies are considered by Congress and not left entirely to the Commission and the courts.

I agree with the plurality's rejection of any meaningful analogy between requiring CATV operators to develop programing and the concept of commandeering someone to engage in broadcasting. Those who exploit the existing broadcast signals for private commercial surface transmission by CATV—to which they make no contribution—are not exactly strangers to the stream of broadcasting. The essence of the matter is that when they interrupt the signal and put it to their own use for profit, they take on burdens, one of which is regulation by the Commission.

I am not fully persuaded that the Commission has made the correct decision in this case and the thoughtful opinions in the Court of Appeals and the dissenting opinion here reflect some of my reservations. But the scope of our review is limited and does not permit me to resolve this issue as perhaps I would were I a member of the Federal Communications Commission. That I might take a different position as a member of the Commission gives me no license to do so here. Congress has created its instrumentality to regulate broadcasting, has given it pervasive powers, and the Commission has generations of experience and "feel" for the problem. I therefore conclude that until Congress acts, the Commission should be allowed wide latitude and I therefore concur in the result reached by this Court.

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE STEW-
ART, MR. JUSTICE POWELL, and MR. JUSTICE REHNQUIST
concur, dissenting.

The policies reflected in the plurality opinion may
be wise ones. But whether CATV systems should be
required to originate programs is a decision that we cer-
tainly are not competent to make and in my judgment
the Commission is not authorized to make. Congress is
the agency to make the decision and Congress has not
acted.

CATV captures TV and radio signals, converts the
signals, and carries them by microwave relay transmission
or by coaxial cables into communities unable to receive
the signals directly. In *United States* v. *Southwestern
Cable Co.*, 392 U. S. 157, we upheld the power of the
Commission to regulate the transmission of signals. As
we said in that case:

> "CATV systems perform either or both of two
> functions. First, they may supplement broadcasting
> by facilitating satisfactory reception of local stations
> in adjacent areas in which such reception would not
> otherwise be possible; and second, they may trans-
> mit to subscribers the signals of distant stations
> entirely beyond the range of local antennae. As
> the number and size of CATV systems have in-
> creased, their principal function has more frequently
> become the importation of distant signals." *Id.*, at
> 163.

CATV evolved after the Communications Act of 1934,
48 Stat. 1064, was passed. But we held that the reach of
the Act, which extends "to all interstate and foreign com-
munication by wire or radio," 47 U. S. C. § 152 (a), was
not limited to the precise methods of communication then
known. 392 U. S., at 173.

Compulsory origination of programs is, however, a far
cry from the regulation of communications approved in

*Southwestern Cable.* Origination requires new invest-
ment and new and different equipment, and an entirely
different cast of personnel.[1]   See 20 F. C. C. 2d 201, 210–
211.  We marked the difference between communica-
tion and origination in *Fortnightly Corp.* v. *United
Artists Television,* 392 U. S. 390, and made clear how
foreign the origination of programs is to CATV's tradi-
tional transmission of signals.  In that case, CATV was
sought to be held liable for infringement of copyrights of
movies licensed to broadcasters and carried by CATV.
We held CATV not liable, saying:

> "Essentially, a CATV system no more than en-
> hances the viewer's capacity to receive the broad-
> caster's signals; it provides a well-located antenna
> with an efficient connection to the viewer's television
> set.   It is true that a CATV system plays an 'active'
> role in making reception possible in a given area,
> but so do ordinary television sets and antennas.
> CATV equipment is powerful and sophisticated, but
> the basic function the equipment serves is little
> different from that served by the equipment gener-
> ally furnished by a television viewer.  If an in-
> dividual erected an antenna on a hill, strung a cable
> to his house, and installed the necessary amplifying
> equipment, he would not be 'performing' the pro-
> grams he received on his television set.   The result
> would be no different if several people combined to
> erect a cooperative antenna for the same purpose.
> The only difference in the case of CATV is that the
> antenna system is erected and owned not by its users
> but by an entrepreneur.

---

[1] In light of the striking difference between origination and com-
munication, the suggestion that "the regulation is no different from
Commission rules governing the technological quality of CATV
broadcast carriage," *ante,* at 669, appears misconceived.

"The function of CATV systems has little in common with the function of broadcasters. CATV systems do not in fact broadcast or rebroadcast. Broadcasters select the programs to be viewed; CATV systems simply carry, without editing, whatever programs they receive. Broadcasters procure programs and propagate them to the public; CATV systems receive programs that have been released· to the public and carry them by private channels to additional viewers. We hold that CATV operators, like viewers and unlike broadcasters, do not perform the programs that they receive and carry." *Id.,* at 399–401.

The Act forbids any person from operating a broadcast station without first obtaining a license from the Commission. 47 U. S. C. § 301. Only qualified persons may obtain licenses and they must operate in the public interest. 47 U. S. C. §§ 308–309. But nowhere in the Act is there the slightest suggestion that a person may be compelled to enter the broadcasting or cablecasting field. Rather, the Act extends "to all interstate and foreign communication by wire or radio . . . which *originates and/or is received* within the United States." 47 U. S. C. § 152 (a) (emphasis added). When the Commission jurisdiction is so limited, it strains logic to hold that this jurisdiction may be expanded by requiring someone to "originate" or "receive."

The Act, when dealing with broadcasters, speaks of "applicants," "applications for licenses," see 47 U. S. C. §§ 307–308, and "whether the public interest, convenience, and necessity will be served by the granting of such application." 47 U. S. C. § 309 (a). The emphasis in the Committee Reports was on "original applications" and "application for the renewal of a license." H. R. Rep. No. 1918, 73d Cong., 2d Sess., 48; S. Rep. No. 781, 73d Cong., 2d Sess., 7, 9. The idea that a carrier

or any other person can be drafted against his will to become a broadcaster is completely foreign to the history of the Act, as I read it.

CATV is simply a carrier having no more control over the message content than does a telephone company. A carrier may, of course, seek a broadcaster's license; but there is not the slightest suggestion in the Act or in its history that a carrier can be bludgeoned into becoming a broadcaster while all other broadcasters live under more lenient rules. There is not the slightest clue in the Act that CATV carriers can be compulsorily converted into broadcasters.

The plurality opinion performs the legerdemain by saying that the requirement of CATV origination is "reasonably ancillary" to the Commission's power to regulate television broadcasting.[2] That requires a brand-new amendment to the broadcasting provisions of the Act, which only the Congress can effect. The Commission is not given *carte blanche* to initiate broadcasting stations; it cannot force people into the business. It cannot say to one who applies for a broadcast outlet in city A that the need is greater in city B and he will be licensed there. The fact that the Commission has authority to regulate origination of programs if CATV decides to enter the field does not mean that it can compel CATV to originate programs. The fact that the Act directs the Commission to encourage the larger and more effective use of radio in the public interest, 47

---

[2] The separate opinion of THE CHIEF JUSTICE reaches the same result by saying "CATV is dependent totally on broadcast signals and is a significant link in the system as a whole and therefore must be seen as within the jurisdiction of the Act." *Ante,* at 675. The difficulty is that this analysis knows no limits short of complete domination of the field of communications by the Commission. This reasoning—divorced as it is from any specific statutory basis—could as well apply to the manufacturers of radio and television broadcasting and receiving equipment.

U. S. C. § 303 (g), relates to the objectives of the Act and does not grant power to compel people to become broadcasters any more than it grants the power to compel broadcasters to become CATV operators.

The upshot of today's decision is to make the Commission's authority over activities "ancillary" to its responsibilities greater than its authority over any broadcast licensee. Of course, the Commission can regulate a CATV that transmits broadcast signals. But to entrust the Commission with the power to force some, a few, or all CATV operators into the broadcast business is to give it a forbidding authority. Congress may decide to do so. But the step is a legislative measure so extreme that we should not find it interstitially authorized in the vague language of the Act.

I would affirm the Court of Appeals.