# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued January 8, 2010                    Decided April 6, 2010

No. 08-1291

COMCAST CORPORATION,
PETITIONER

v.

FEDERAL COMMUNICATIONS COMMISSION AND UNITED
STATES OF AMERICA,
RESPONDENTS

NBC UNIVERSAL, ET AL.,
INTERVENORS

---

On Petition for Review of an Order
of the Federal Communications Commission

---

*Helgi C. Walker* argued the cause for petitioner. With
her on the briefs were *Eve Klindera Reed*, *Elbert Lin*, *David
P. Murray*, *James L. Casserly*, and *David H. Solomon*.

*Howard J. Symons* argued the cause for intervenors
National Cable & Telecommunications Association and NBC
Universal. With him on the briefs were *Neal M. Goldberg*,
*Michael S. Schooler*, and *Margaret L. Tobey*. *Richard Cotton*
entered an appearance.

*Kyle D. Dixon* was on the brief for *amici curiae* Professors James B. Speta and Glen O. Robinson and The Progress and Freedom Foundation in support of petitioner.

*Austin C. Schlick*, General Counsel, Federal Communications Commission, argued the cause for respondents. With him on the brief were *Catherine G. O'Sullivan* and *Nancy C. Garrison*, Attorneys, U.S. Department of Justice, *Joseph R. Palmore*, Deputy General Counsel, Federal Communications Commission, *Richard K. Welch*, Deputy Associate General Counsel, and *Joel Marcus*, Counsel. *Daniel M. Armstrong III*, Associate General Counsel, entered an appearance.

*Marvin Ammori* argued the cause for intervenors Free Press, et al. in support of respondents. With him on the brief were *Henry Goldberg*, *Harold Feld*, and *Andrew Jay Schwartzman*.

*John F. Blevins* was on the brief for *amici curiae* Professors Jack M. Balkin, et al. in support of respondents.

Before: SENTELLE, *Chief Judge*, TATEL, *Circuit Judge*, and RANDOLPH, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: In this case we must decide whether the Federal Communications Commission has authority to regulate an Internet service provider's network management practices. Acknowledging that it has no express statutory authority over such practices, the Commission relies on section 4(i) of the Communications Act of 1934, which authorizes the Commission to "perform any and all acts, make such rules and regulations, and issue such orders, not

inconsistent with this chapter, as may be necessary in the execution of its functions." 47 U.S.C. § 154(i). The Commission may exercise this "ancillary" authority only if it demonstrates that its action—here barring Comcast from interfering with its customers' use of peer-to-peer networking applications—is "reasonably ancillary to the . . . effective performance of its statutorily mandated responsibilities." *Am. Library Ass'n v. FCC*, 406 F.3d 689, 692 (D.C. Cir. 2005). The Commission has failed to make that showing. It relies principally on several Congressional statements of policy, but under Supreme Court and D.C. Circuit case law statements of policy, by themselves, do not create "statutorily mandated responsibilities." The Commission also relies on various provisions of the Communications Act that do create such responsibilities, but for a variety of substantive and procedural reasons those provisions cannot support its exercise of ancillary authority over Comcast's network management practices. We therefore grant Comcast's petition for review and vacate the challenged order.

## I.

In 2007 several subscribers to Comcast's high-speed Internet service discovered that the company was interfering with their use of peer-to-peer networking applications. *See* Peter Svensson, *Comcast Blocks Some Internet Traffic*, ASSOCIATED PRESS, Oct. 19, 2007. Peer-to-peer programs allow users to share large files directly with one another without going through a central server. Such programs also consume significant amounts of bandwidth.

Challenging Comcast's action, two non-profit advocacy organizations, Free Press and Public Knowledge, filed a complaint with the Federal Communications Commission and, together with a coalition of public interest groups and law professors, a petition for declaratory ruling. Compl. of

Free Press & Public Knowledge Against Comcast Corp., File No. EB-08-IH-1518 (Nov. 1, 2007) ("Compl."); Pet. of Free Press et al. for Decl. Ruling, WC Docket No. 07-52 (Nov. 1, 2007) ("Pet."). Both filings argued that Comcast's actions "violat[ed] the FCC's Internet Policy Statement." Compl. at 1; Pet. at i. Issued two years earlier, that statement "adopt[ed] the . . . principles" that "consumers are entitled to access the lawful Internet content of their choice . . . [and] to run applications and use services of their choice." *In re Appropriate Framework for Broadband Access to the Internet Over Wireline Facilities*, 20 F.C.C.R. 14,986, 14,988, ¶ 4 (2005). Comcast defended its interference with peer-to-peer programs as necessary to manage scarce network capacity. Comments of Comcast Corp. at 14, WC Docket No. 07-52 (Feb. 12, 2008).

Following a period of public comment, the Commission issued the order challenged here. *In re Formal Compl. of Free Press & Public Knowledge Against Comcast Corp. for Secretly Degrading Peer-to-Peer Applications*, 23 F.C.C.R. 13,028 (2008) (*Order*). The Commission began by concluding not only that it had jurisdiction over Comcast's network management practices, but also that it could resolve the dispute through adjudication rather than through rulemaking. *Id.* at 13,033–50, ¶¶ 12–40. On the merits, the Commission ruled that Comcast had "significantly impeded consumers' ability to access the content and use the applications of their choice," *id.* at 13,054, ¶ 44, and that because Comcast "ha[d] several available options it could use to manage network traffic without discriminating" against peer-to-peer communications, *id.* at 13,057, ¶ 49, its method of bandwidth management "contravene[d] . . . federal policy," *id.* at 13,052, ¶ 43. Because by then Comcast had agreed to adopt a new system for managing bandwidth demand, the Commission simply ordered it to make a set of disclosures

describing the details of its new approach and the company's progress toward implementing it. *Id.* at 13,059–60, ¶ 54. The Commission added that an injunction would automatically issue should Comcast either fail to make the required disclosures or renege on its commitment. *Id.* at 13,060, ¶ 55.

Although Comcast complied with the *Order*, it now petitions for review, presenting three objections. First, it contends that the Commission has failed to justify exercising jurisdiction over its network management practices. Second, it argues that the Commission's adjudicatory action was procedurally flawed because it circumvented the rulemaking requirements of the Administrative Procedure Act and violated the notice requirements of the Due Process Clause. Finally, it asserts that parts of the *Order* are so poorly reasoned as to be arbitrary and capricious. We begin—and end—with Comcast's jurisdictional challenge.

## II.

Through the Communications Act of 1934, ch. 652, 48 Stat. 1064, as amended over the decades, 47 U.S.C. § 151 *et seq.*, Congress has given the Commission express and expansive authority to regulate common carrier services, including landline telephony, *id.* § 201 *et seq.* (Title II of the Act); radio transmissions, including broadcast television, radio, and cellular telephony, *id.* § 301 *et seq.* (Title III); and "cable services," including cable television, *id.* § 521 *et seq.* (Title VI). In this case, the Commission does not claim that Congress has given it express authority to regulate Comcast's Internet service. Indeed, in its still-binding 2002 *Cable Modem Order*, the Commission ruled that cable Internet service is neither a "telecommunications service" covered by Title II of the Communications Act nor a "cable service" covered by Title VI. *In re High-Speed Access to the Internet Over Cable and Other Facilities*, 17 F.C.C.R. 4798, 4802, ¶ 7

(2002), *aff'd Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967 (2005). The Commission therefore rests its assertion of authority over Comcast's network management practices on the broad language of section 4(i) of the Act: "The Commission may perform any and all acts, make such rules and regulations, and issue such orders, not inconsistent with this chapter, as may be necessary in the execution of its functions," 47 U.S.C. § 154(i). *Order*, 23 F.C.C.R. at 13,036, ¶ 15.

Courts have come to call the Commission's section 4(i) power its "ancillary" authority, a label that derives from three foundational Supreme Court decisions: *United States v. Southwestern Cable Co.*, 392 U.S. 157 (1968), *United States v. Midwest Video Corp.*, 406 U.S. 649 (1972) (*Midwest Video I*), and *FCC v. Midwest Video Corp.*, 440 U.S. 689 (1979) (*Midwest Video II*). All three cases dealt with Commission jurisdiction over early cable systems at a time when, as with the Internet today, the Communications Act gave the Commission no express authority to regulate such systems. (Title VI, which gives the Commission jurisdiction over "cable services," was not added to the statute until 1984. *See* Cable Communications Policy Act of 1984, Pub. L. No. 98-549, 98 Stat. 2779.)

In the first case, *Southwestern Cable*, the Supreme Court considered a challenge to a Commission order restricting the geographic area in which a cable company could operate. 392 U.S. at 160. At that time, cable television, then known as "community antenna television" (CATV), functioned quite differently than it does today. Employing strategically located antennae, these early cable systems simply received over-the-air television broadcasts and retransmitted them by cable to their subscribers. *Id.* at 161–62. Although they rarely produced their own programming, they improved

reception and allowed subscribers to receive television programs from distant stations. *Id.* at 162–63. Seeking to protect Commission-licensed local broadcasters, the Commission adopted rules limiting the extent to which cable systems could retransmit distant signals and, in the order at issue in *Southwestern Cable*, applied this policy to a particular company. The Supreme Court sustained that order, explaining that even though the then-existing Communications Act gave the Commission no express authority over cable television, the Commission could nonetheless regulate cable television to the extent "reasonably ancillary to the effective performance of the Commission's various responsibilities for the regulation of television broadcasting." *Id.* at 178. Four years later, in *Midwest Video I*, the Court again sustained the Commission's use of its ancillary authority, this time to support issuance of a regulation that required cable operators to facilitate the creation of new programs and to transmit them alongside broadcast programs they captured from the air. 406 U.S. at 670. In *Midwest Video II*, the Court rejected the Commission's assertion of ancillary authority, setting aside regulations that required cable systems to make certain channels available for public use. 440 U.S. at 708–09.

We recently distilled the holdings of these three cases into a two-part test. In *American Library Ass'n v. FCC*, we wrote: "The Commission . . . may exercise ancillary jurisdiction only when two conditions are satisfied: (1) the Commission's general jurisdictional grant under Title I [of the Communications Act] covers the regulated subject and (2) the regulations are reasonably ancillary to the Commission's effective performance of its statutorily mandated responsibilities." 406 F.3d at 691–92; *see also Order*, 23 F.C.C.R. at 13,035, ¶ 15 n.64 (citing the *American Library* test). Comcast concedes that the Commission's action here

satisfies the first requirement because the company's Internet service qualifies as "interstate and foreign communication by wire" within the meaning of Title I of the Communications Act. 47 U.S.C. § 152(a). Whether the Commission's action satisfies *American Library*'s second requirement is the central issue in this case.

## III.

Before addressing that issue, however, we must consider two threshold arguments the Commission raises. First, it asserts that given a contrary position Comcast took in a California lawsuit, the company should be judicially estopped from challenging the Commission's jurisdiction over the company's network management practices. Second, the Commission argues that even if Comcast's challenge can proceed, we need not go through our usual ancillary authority analysis because a recent Supreme Court decision, *National Cable & Telecommunications Ass'n v. Brand X Internet Services*, 545 U.S. 967, makes clear that the Commission had authority to issue the *Order*.

## A.

Courts may invoke judicial estoppel "[w]here a party assumes a certain position in a legal proceeding, . . . succeeds in maintaining that position, . . . [and then,] simply because his interests have changed, assume[s] a contrary position." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (internal quotation marks omitted). For judicial estoppel to apply, however, "a party's later position must be 'clearly inconsistent' with its earlier position." *Id.* at 750 (quoting *United States v. Hook*, 195 F.3d 299, 306 (7th Cir. 1999)). "Doubts about inconsistency often should be resolved by assuming there is no disabling inconsistency, so that the second matter may be resolved on the merits." 18B CHARLES

ALAN WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE §4477, at 594 (2d ed. 2002).

The Commission's estoppel argument rests on the position Comcast took while defending against a civil action in a California federal court. In that case, one of Comcast's Internet customers challenged the company's interference with peer-to-peer programs at the same time Free Press and Public Knowledge were pressing their own challenges before the Commission. Comcast responded by moving to stay the litigation pending resolution of the Commission proceedings. In support, it invoked the "primary jurisdiction doctrine," arguing that "a court is 'obliged to defer' to an agency where the 'issue brought before a court is in the process of litigation through procedures originating in the [agency].'" Def.'s Mem. of Law in Supp. of Mot. for J. on Pleadings at 10, *Hart v. Comcast of Alameda, Inc.*, No. 07-6350 (N.D. Cal. 2008) ("Comcast Cal. Mem.") (quoting *Fed. Power Comm'n v. La. Power & Light Co.*, 406 U.S. 621, 647 (1972)). In language the Commission now emphasizes, Comcast continued: "Any inquiry into whether Comcast's [peer-to-peer] management is unlawful falls squarely within the FCC's subject matter jurisdiction." *Id.* Persuaded, the district court granted the requested stay.

According to the Commission, when Comcast argued that the Commission has "subject matter jurisdiction" over its disputed network management practices, it was saying that any action by the Commission to prohibit those practices would satisfy both elements of the *American Library* test and thus lie within the Commission's ancillary authority. "Because Comcast prevailed . . . on [that] theory," the Commission contends, "it should be estopped from arguing the opposite here." Resp't's Br. 30. For its part, Comcast

insists it never argued that the Commission could justify exercising ancillary authority over its network management practices. Instead, it claims that in saying that the Commission possesses "subject matter jurisdiction" over those practices, it was arguing no more than what it concedes here, namely that its Internet service constitutes "communication by wire" within the meaning of *American Library*'s first requirement. Interpreted that way, Comcast's California position does not conflict with the argument it makes here, which rests on *American Library*'s second requirement: that the Commission must show that its regulation of Comcast's Internet service is "reasonably ancillary to the Commission's effective performance of its statutorily mandated responsibilities." 406 F.3d at 692.

Although the parties' competing interpretations of Comcast's California argument are both plausible, Comcast's is more so. For one thing, its interpretation comports with the overall primary jurisdiction argument it advanced in that case. As a leading administrative law treatise explains, "The question of whether an issue is within [an] agency's primary jurisdiction is different from the question of whether the agency actually has exclusive statutory jurisdiction to resolve an issue." 2 RICHARD J. PIERCE, JR., ADMINISTRATIVE LAW TREATISE § 14.1, at 1162 (5th ed. 2010). Specifically, for an issue to fall within an agency's primary jurisdiction, the agency need not possess definite authority to resolve it; rather, there need only be "sufficient statutory support for administrative authority . . . that the agency should at least be requested to . . . proceed[]" in the first instance. *Ricci v. Chicago Mercantile Exch.*, 409 U.S. 289, 304, 300 (1973) (holding that a dispute fell within the Commodity Exchange Commission's primary jurisdiction where the Commodity Exchange Act "at least arguably protected or prohibited" the conduct at issue). Given this standard, and given that then, as

now, the Commission claimed ancillary authority over Comcast's network management practices, the company could plausibly argue in the California case (as it claims it did) that deference to the Commission's primary jurisdiction was appropriate merely because the disputed practices involved "communication by wire"—*American Library*'s first requirement. And as Comcast emphasized in the California case, the Commission was already "actively investigating" the company's network management practices, Comcast Cal. Mem. at 11, increasing the risk that the civil case could disrupt the regulatory process. *See* PIERCE, ADMINISTRATIVE LAW TREATISE § 14.1, at 1162 ("[D]etermination of the agency's primary jurisdiction involves a . . . pragmatic evaluation of the advantages and disadvantages of allowing the agency to resolve an issue in the first instance."). Therefore, the California court could have fairly concluded under the primary jurisdiction doctrine that the Commission should determine in the first instance whether regulating Comcast's network management practices would be "reasonably ancillary to the Commission's effective performance of its statutorily mandated responsibilities"— *American Library*'s second requirement. 406 F.3d at 692.

Reinforcing Comcast's interpretation, the Commission itself generally uses "subject matter jurisdiction" to refer only to the first part of the *American Library* test rather than the test as a whole. For example, in an earlier Internet-related order (cited by Comcast in its California brief), the Commission wrote that it "may exercise its ancillary jurisdiction when Title I of the Act gives the Commission *subject matter jurisdiction* over the service to be regulated *and* the assertion of jurisdiction is reasonably ancillary to the effective performance of its various responsibilities." *In re Appropriate Framework for Broadband Access to the Internet Over Wireline Facilities*, 20 F.C.C.R. 14,853, 14,913–14,

¶ 109 (2005) (emphasis added) (internal quotation marks and alteration omitted); *accord In re Consumer Information and Disclosure,* 24 F.C.C.R. 11,380, 11,400, ¶ 62 (2009); *In re IP-Enabled Services*, 24 F.C.C.R. 6039, 6044–45, ¶ 9 (2009); *In re High-Cost Universal Service Support*, 24 F.C.C.R. 6475, 6540, ¶ 101 (2008).

We thus do not interpret Comcast's California argument as "inconsistent" with its argument here, let alone "clearly" so. *New Hampshire*, 532 U.S. at 750 (internal quotation marks omitted). Because Comcast never clearly argued in the California litigation that the Commission's assertion of authority over the company's network management practices would be "reasonably ancillary to the Commission's effective performance of its statutorily mandated responsibilities" (*American Library*'s second requirement), 406 F.3d at 692, that question remains for us to answer.

## B.

The Commission's second threshold argument is that the Supreme Court's decision in *Brand X* "already decided the jurisdictional question here." Resp't's Br. 20. In that case, the Court reviewed the Commission's 2002 *Cable Modem Order*, *supra* at 5–6, which removed cable Internet service from Title II and Title VI oversight by classifying it as an "information service." *See Brand X*, 545 U.S. at 978. Challenging that determination, Brand X argued that cable Internet actually comprises a bundle of two services: an "information service" not subject to Commission regulation and a "telecommunications service" subject to mandatory Title II regulation. *Id.* at 990–91. Brand X pressed this argument because if Title II applied to cable Internet, then, under its view, cable companies would have to unbundle the components of their Internet services, thus allowing Brand X and other independent Internet service providers (ISPs) to use

the telecommunications component of those bundles to offer competing Internet service over cable company wires. Brand X Resp'ts' Br. at 10, *Brand X*, 545 U.S. 967 (No. 04-277) ("[I]f the telecommunications component of cable modem service is a 'telecommunications service,' and hence common carriage, . . . [c]ustomers then will be able to choose their provider of Internet services.").

Although the Supreme Court acknowledged that cable Internet service does contain a telecommunications "component," it deferred to the Commission's determination that this component is "functionally integrated" into a single "offering" properly classified as an "information service." 545 U.S. at 991. Using language the Commission now emphasizes, the Court went on to say that "the Commission remains free to impose special regulatory duties on [cable Internet providers] under its Title I ancillary jurisdiction." *Id.* at 996. In particular, the Court suggested that the Commission could likely "require cable companies to allow independent ISPs access to their facilities" pursuant to its ancillary authority, rather than using Title II as Brand X urged. *Id.* at 1002. According to the Commission, this means that "the FCC has authority over [information service providers] under its Title I ancillary jurisdiction." Resp't's Br. 20.

Comcast insists that the references to ancillary jurisdiction in *Brand X* are dicta: "*Brand X* presented the question whether the FCC had permissibly classified cable Internet services as 'information services,' not whether any particular regulation of such services was within the agency's statutory authority." Pet'r's Br. 53. Although Comcast may well be correct, "carefully considered language of the Supreme Court, even if technically dictum, generally must be treated as authoritative." *United States v. Oakar,* 111 F.3d

146, 153 (D.C. Cir. 1997) (internal quotation marks and alteration omitted). In the end, however, we need not decide whether the Court's discussion of ancillary authority in *Brand X* qualifies as "authoritative," for even if it does the Commission stretches the Court's words too far. By leaping from *Brand X*'s observation that the Commission's ancillary authority may allow it to impose *some* kinds of obligations on cable Internet providers to a claim of plenary authority over such providers, the Commission runs afoul of *Southwestern Cable* and *Midwest Video I.*

In *Southwestern Cable*, in which the Court first recognized the Commission's ancillary authority, it expressly reserved for future cases the question whether particular regulations fall within that power. Although the Court upheld the cable television order at issue, it declined "to determine in detail the limits of the Commission's authority to regulate CATV." 392 U.S. at 178. Then in *Midwest Video I*, the Court made clear that the permissibility of each new exercise of ancillary authority must be evaluated on its own terms. That is, the Court asked whether the particular regulation at issue was "reasonably ancillary to the effective performance of the Commission's various responsibilities for the regulation of television broadcasting." 406 U.S. at 670 (plurality opinion) (internal quotation marks omitted); *see also id.* at 675 (Burger, C.J., concurring). Contrary to the kind of inference the Commission would have us draw from *Brand X*, nothing in *Midwest Video I* even hints that *Southwestern Cable*'s recognition of ancillary authority over one aspect of cable television meant that the Commission had plenary authority over all aspects of cable.

We made just this point in *National Ass'n of Regulatory Utility Commissioners v. FCC*, 533 F.2d 601 (D.C. Cir. 1976) (*NARUC II*). There we reviewed a series of Commission

orders that preempted state regulation of non-video uses of cable systems, including precursors to modern cable modem service. *See id.* at 616 ("[T]he point-to-point communications . . . involve one computer talking to another . . . ."). Leaning on its recent victories in *Southwestern Cable* and *Midwest Video I*, the Commission argued—similar to the way it uses *Brand X* here—that the combined force of those two "affirmances of FCC powers over cable must be seen as establishing a jurisdiction over all activities of cable operators." *Id.* at 611. We rejected that argument, explaining that *Southwestern Cable* and *Midwest Video I* foreclosed the Commission's broad view of ancillary authority. We pointed out that in *Southwestern Cable* the Court "stated explicitly that its holding was limited to . . . reasonably ancillary activities, and expressly declined to comment on 'the Commission's authority, if any, to regulate CATV under any other circumstances or for any other purposes.'" *Id.* at 612–13 (quoting *Southwestern Cable*, 392 U.S. at 178). We similarly noted that in *Midwest Video I* the plurality "relied explicitly on the *Southwestern* reasoning, and devoted substantial attention to establishing the requisite 'ancillariness' between the Commission's authority over broadcasting and the particular regulation before the Court." *Id.* at 613. Neither case, we concluded, "recogniz[ed] any sweeping authority over [cable] as a whole." *Id.* at 612. Instead, they "command[ed] that each and every assertion of jurisdiction over cable television must be *independently justified* as reasonably ancillary to the Commission's power over broadcasting." *Id.* (emphasis added).

Echoing this interpretation, the Supreme Court in *Midwest Video II* described *Southwestern Cable* "as conferring on the Commission a circumscribed range of power to regulate cable television," a determination "reaffirmed" in *Midwest Video I*. 440 U.S. at 696. "The

question now before us," the Court continued, "is whether the [Communications] Act, as construed in these two cases, authorizes the capacity and access regulations that are here under challenge." *Id.* The Court ultimately concluded that it did not, thus reinforcing the principle that the Commission must defend its exercise of ancillary authority on a case-by-case basis.

To be sure, *Brand X* dealt with the Internet, not cable television. Nothing in *Brand X*, however, suggests that the Court was abandoning the fundamental approach to ancillary authority set forth in *Southwestern Cable*, *Midwest Video I*, and *Midwest Video II.* Accordingly, the Commission cannot justify regulating the network management practices of cable Internet providers simply by citing *Brand X*'s recognition that it may have ancillary authority to require such providers to unbundle the components of their services. These are altogether different regulatory requirements. *Brand X* no more dictates the result of this case than *Southwestern Cable* dictated the results of *Midwest Video I*, *NARUC II*, and *Midwest Video II*. The Commission's exercise of ancillary authority over Comcast's network management practices must, to repeat, "be independently justified." *NARUC II*, 533 F.2d at 612. It is to that issue that we now turn.

## IV.

The Commission argues that the *Order* satisfies *American Library*'s second requirement because it is "reasonably ancillary to the Commission's effective performance" of its responsibilities under several provisions of the Communications Act. These provisions fall into two categories: those that the parties agree set forth only congressional policy and those that at least arguably delegate regulatory authority to the Commission. We consider each in turn.

**A.**

The Commission relies principally on section 230(b), part of a provision entitled "Protection for private blocking and screening of offensive material," 47 U.S.C. § 230, that grants civil immunity for such blocking to providers of interactive computer services, *id.* § 230(c)(2). Setting forth the policies underlying this protection, section 230(b) states, in relevant part, that "[i]t is the policy of the United States . . . to promote the continued development of the Internet and other interactive computer services" and "to encourage the development of technologies which maximize user control over what information is received by individuals, families, and schools who use the Internet." *Id.* § 230(b). In this case the Commission found that Comcast's network management practices frustrated both objectives. *Order*, 23 F.C.C.R. at 13,052–53, ¶ 43.

In addition to section 230(b), the Commission relies on section 1, in which Congress set forth its reasons for creating the Commission in 1934: "For the purpose of regulating interstate and foreign commerce in communication by wire and radio so as to make available, so far as possible, to all the people of the United States . . . a rapid, efficient, Nation-wide, and world-wide wire and radio communication service . . . at reasonable charges, . . . there is created a commission to be known as the 'Federal Communications Commission' . . . ." 47 U.S.C. § 151. The Commission found that "prohibiting unreasonable network discrimination directly furthers the goal of making broadband Internet access service both 'rapid' and 'efficient.'" *Order*, 23 F.C.C.R. at 13,036–37, ¶ 16.

Comcast argues that neither section 230(b) nor section 1 can support the Commission's exercise of ancillary authority because the two provisions amount to nothing more than congressional "statements of policy." Pet'r's Br. 46. Such

statements, Comcast contends, "are not an operative part of the statute, and do not enlarge or confer powers on administrative agencies. As such, they necessarily fail to set forth 'statutorily mandated responsibilities'" within the meaning of *American Library*. *Id*. at 47 (citations, internal quotation marks, and alteration omitted).

The Commission acknowledges that section 230(b) and section 1 are statements of policy that themselves delegate no regulatory authority. Still, the Commission maintains that the two provisions, like all provisions of the Communications Act, set forth "statutorily mandated responsibilities" that can anchor the exercise of ancillary authority. "The operative provisions of statutes are those which *declare the legislative will*," the Commission asserts. Resp't's Br. 39 (internal quotation marks and alteration omitted). "Here, the legislative will has been declared by Congress in the form of a policy, along with an express grant of authority to the FCC to perform all actions necessary to execute and enforce all the provisions of the Communications Act." *Id*.

In support of its reliance on congressional statements of policy, the Commission points out that in both *Southwestern Cable* and *Midwest Video I* the Supreme Court linked the challenged Commission actions to the furtherance of various congressional "goals," "objectives," and "policies." *See, e.g.*, *Southwestern Cable*, 392 U.S. at 175; *Midwest Video I*, 406 U.S. at 665, 669 (plurality opinion). In particular, the Commission notes that in *Midwest Video I*, the plurality accepted its argument that the Commission's "concern with CATV carriage of broadcast signals . . . extends . . . to requiring CATV affirmatively to further statutory *policies*." 406 U.S. at 664 (plurality opinion) (emphasis added) (internal quotation marks omitted). According to the Commission, since congressional statements of policy were sufficient to

support ancillary authority over cable television, it may likewise rely on such statements—section 230(b) and section 1—to exercise ancillary authority over the network management practices of Internet providers.

We read *Southwestern Cable* and *Midwest Video I* quite differently. In those cases, the Supreme Court relied on policy statements not because, standing alone, they set out "statutorily mandated responsibilities," but rather because they did so in conjunction with an express delegation of authority to the Commission, i.e., Title III's authority to regulate broadcasting. In *Southwestern Cable*, the Commission argued that restricting the geographic reach of cable television was necessary to fulfill its Title III responsibility to foster local broadcast service. The Court agreed, explaining that "Congress has imposed upon the Commission the 'obligation of providing a widely dispersed radio and television service,' with a 'fair, efficient, and equitable distribution' of service among the 'several States and communities.' The Commission has, for this and other purposes, been granted authority to allocate broadcasting zones or areas, and to provide regulations 'as it may deem necessary' to prevent interference among the various stations." 392 U.S. at 173–74 (citation and footnote omitted) (quoting S. REP. NO. 86-923, at 7 (1959), 47 U.S.C. § 307(b), 303(f)). The Court concluded that "the Commission has reasonably found that the successful performance of these duties demands prompt and efficacious regulation of community antenna television systems." *Id.* at 177. Nonetheless, the Court "emphasize[d] that the authority which we recognize today . . . is restricted to that reasonably ancillary to the effective performance of the Commission's various responsibilities for the *regulation of television broadcasting*." *Id.* at 178 (emphasis added).

In *Midwest Video I*, the Court again made clear that it was sustaining the challenged regulation—requiring cable companies to originate their own programming—only because of its connection to the Commission's Title III authority over broadcasting. A four-Justice plurality agreed with the Commission that the challenged rule would "further the achievement of long-established regulatory goals in the field of television broadcasting by increasing the number of outlets for community self-expression and augmenting the public's choice of programs and types of services." 406 U.S. at 667–68 (plurality opinion) (internal quotation marks omitted). Because the regulation "preserve[d] and enhance[d] the integrity of broadcast signals" it satisfied *Southwestern Cable*, i.e., it was "reasonably ancillary to the effective performance of the Commission's various responsibilities for the *regulation of television broadcasting*." *Id.* at 670 (emphasis added) (internal quotation marks omitted). Chief Justice Burger made the same point in a controlling concurring opinion: "CATV is dependent totally on broadcast signals and is a significant link in the system as a whole and therefore must be seen as within the jurisdiction of the Act." *Id.* at 675 (Burger, C.J., concurring). That said, he warned, "candor requires acknowledgment . . . that the Commission's position strains the outer limits of" its authority. *Id.* at 676.

The Commission exceeded those "outer limits" in both *NARUC II* and *Midwest Video II*. In *NARUC II*, the Commission defended its exercise of ancillary authority over non-video cable communications (as it does here with respect to Comcast's network management practices) on the basis of section 1's "overall statutory mandate to make available, so far as possible, to all the people of the United States a rapid, efficient, [N]ation-wide, and world-wide wire and radio communications service." 533 F.2d at 606 (internal quotation marks and alteration omitted). The Commission "reasoned

that this language called for the development of a nationwide broadband communications grid in which cable systems should play an important part." *Id.* (internal quotation marks omitted). We rejected that argument. Relying on *Southwestern Cable* and *Midwest Video I*, we began by explaining that the Commission's ancillary authority "is really incidental to, and contingent upon, *specifically delegated powers under the Act*." *Id.* at 612 (emphasis added). Applying that standard, we found it "difficult to see how any action which the Commission might take concerning two-way cable communications could have as its primary impact the furtherance of any broadcast purpose." *Id.* at 615. Because the regulations had not been "justified as reasonably ancillary to the Commission's power over *broadcasting*," *id.* at 612, we vacated them.

In *Midwest Video II*, the Supreme Court rejected the Commission's assertion of ancillary authority to impose a public access requirement on certain cable channels because doing so would "relegate[] cable systems . . . to common-carrier status." 440 U.S. at 700–01. Pointing out that the Communications Act expressly prohibits common carrier regulation of *broadcasters*, *id.* at 702, the Court held that given the derivative nature of ancillary jurisdiction the same prohibition applied to the Commission's regulation of *cable providers*. The Commission had opposed this logic, arguing that it could regulate "so long as the rules promote statutory objectives." *Id.* The Court rejected that broad claim and, revealing the flaw in the argument the Commission makes here, emphasized that "without reference to the provisions of the Act *directly governing broadcasting*, the Commission's [ancillary] jurisdiction . . . would be unbounded." *Id.* at 706 (emphasis added). "Though afforded wide latitude in its supervision over communication by wire," the Court added,

"the Commission was not delegated unrestrained authority." *Id.*

The teaching of *Southwestern Cable*, *Midwest Video I*, *Midwest Video II*, and *NARUC II*—that policy statements alone cannot provide the basis for the Commission's exercise of ancillary authority—derives from the "axiomatic" principle that "administrative agencies may [act] only pursuant to authority delegated to them by Congress." *Am. Library*, 406 F.3d at 691. Policy statements are just that—statements of policy. They are not delegations of regulatory authority. To be sure, statements of congressional policy can help delineate the contours of statutory authority. Consider, for example, the various services over which the Commission enjoys express statutory authority. When exercising its Title II authority to set "just and reasonable" rates for phone service, 47 U.S.C. § 201(b), or its Title III authority to grant broadcasting licenses in the "public convenience, interest, or necessity," *id.* § 307(a), or its Title VI authority to prohibit "unfair methods of competition" by cable operators that limit consumer access to certain types of television programming, *id.* § 548(b), the Commission must bear in mind section 1's objective of "Nation-wide . . . wire and radio communication service . . . at reasonable charges," *id.* § 151. In all three examples, section 1's policy goal undoubtedly illuminates the scope of the "authority delegated to [the Commission] by Congress," *Am. Library*, 406 F.3d at 691—though it is Titles II, III, and VI that do the delegating. So too with respect to the Commission's section 4(i) ancillary authority. Although policy statements may illuminate that authority, it is Title II, III, or VI to which the authority must ultimately be ancillary.

In this case the Commission cites neither section 230(b) nor section 1 to shed light on any express statutory delegation of authority found in Title II, III, VI, or, for that matter,

anywhere else. That is, unlike the way it successfully employed policy statements in *Southwestern Cable* and *Midwest Video I*, the Commission does not rely on section 230(b) or section 1 to argue that its regulation of an activity over which it concededly has no express statutory authority (here Comcast's Internet management practices) is necessary to further its regulation of activities over which it does have express statutory authority (here, for example, Comcast's management of its Title VI cable services). In this respect, this case is just like *NARUC II*. On the record before us, we see "no relationship whatever," *NARUC II*, 533 F.2d at 616, between the *Order* and services subject to Commission regulation. Perhaps the Commission could use section 230(b) or section 1 to demonstrate such a connection, but that is not how it employs them here.

Instead, the Commission maintains that congressional policy by itself creates "statutorily mandated responsibilities" sufficient to support the exercise of section 4(i) ancillary authority. Not only is this argument flatly inconsistent with *Southwestern Cable*, *Midwest Video I*, *Midwest Video II*, and *NARUC II*, but if accepted it would virtually free the Commission from its congressional tether. As the Court explained in *Midwest Video II*, "without reference to the provisions of the Act" expressly granting regulatory authority, "the Commission's [ancillary] jurisdiction . . . would be unbounded." 440 U.S. at 706. Indeed, Commission counsel told us at oral argument that just as the *Order* seeks to make Comcast's Internet service more "rapid" and "efficient," *Order*, 23 F.C.C.R. 13,036–37, ¶ 16, the Commission could someday subject Comcast's Internet service to pervasive rate regulation to ensure that the company provides the service at "reasonable charges," 47 U.S.C. § 151. Oral Arg. Tr. 58–59. Were we to accept that theory of ancillary authority, we see no reason why the Commission would have to stop there, for

we can think of few examples of regulations that apply to Title II common carrier services, Title III broadcast services, or Title VI cable services that the Commission, relying on the broad policies articulated in section 230(b) and section 1, would be unable to impose upon Internet service providers.  If in *Midwest Video I* the Commission "strain[ed] the outer limits of even the open-ended and pervasive jurisdiction that has evolved by decisions of the Commission and the courts," 406 U.S. at 676 (Burger, C.J., concurring), and if in *NARUC II* and *Midwest Video II* it exceeded those limits, then here it seeks to shatter them entirely.

Attempting to avoid this conclusion, the Commission argues that in several more recent cases we upheld its use of ancillary authority on the basis of policy statements alone.  In each of those cases, however, we sustained the exercise of ancillary authority because, unlike here, the Commission had linked the cited policies to express delegations of regulatory authority.

The Commission places particular emphasis on *Computer and Communications Industry Ass'n v. FCC*, 693 F.2d 198 (D.C. Cir. 1982) (*CCIA*).  There we considered a challenge to the Commission's landmark 1980 *Computer II Order*, in which the Commission set forth regulatory ground rules for common carriers that provided so-called enhanced services, i.e., precursors to modern information services like cable Internet.  *See In re Amend. of § 64.702 of the Comm'n's Rules and Regulations (Second Computer Inquiry),* 77 F.C.C.2d 384, 385–89, ¶¶ 1–13 (1980).  The petitioners argued that two aspects of the *Computer II Order* exceeded the Commission's ancillary authority.  First, the Commission had ruled that AT&T, then the monopoly telephone provider throughout most of the nation, could offer enhanced services only through a separate subsidiary.  *CCIA*, 693 F.2d at 205.

Second, the Commission had mandated that all common carriers unbundle charges for "consumer premises equipment" (CPE)—i.e., telephones, computer terminals, and other similar devices—from their regulated tariffs. *Id.* We sustained both requirements. Emphasizing, as we do here, that *Southwestern Cable* "limited the Commission's jurisdiction to that which is reasonably ancillary to the effective performance of the Commission's various responsibilities," we explained that "[o]ne of those responsibilities is to assure a nationwide system of wire communications services at reasonable prices." *Id.* at 213 (internal quotation marks omitted). According to the Commission, this latter language demonstrates that section 1 describes "statutorily mandated responsibilities." But the Commission reads our statement out of context.

The crux of our decision in *CCIA* was that in its *Computer II Order* the Commission had linked its exercise of ancillary authority to its Title II responsibility over common carrier rates—just the kind of connection to statutory authority missing here. Thus, with respect to the AT&T component of the order, we relied on the Commission's finding that "[r]egulation of enhanced services was . . . necessary to prevent AT&T from burdening its basic transmission service customers with part of the cost of providing competitive enhanced services." *Id.* "Given [the] potentially symbiotic relationship between competitive and monopoly services," we concluded that "the agency charged with ensuring that monopoly rates are just and reasonable can legitimately exercise jurisdiction over the provision of competitive services." *Id.* We made the same point with respect to the order's CPE component: "[E]xercising jurisdiction over CPE was necessary to carry out [the Commission's] duty to assure the availability of transmission services at reasonable rates." *Id.* So, when we wrote that

"[o]ne of [the Commission's] responsibilities is to assure a nationwide system of wire communications services at reasonable prices," *id.*, we were using section 1's language in just the way required by *Southwestern Cable*, *Midwest Video I*, *Midwest Video II*, and *NARUC II*: for the light it sheds on the Commission's Title II ratemaking power. In other words, we viewed the Commission's *Computer II Order*—like the Supreme Court had viewed the regulations at issue in *Southwestern Cable*—as regulation of services otherwise beyond the Commission's authority in order to prevent frustration of a regulatory scheme expressly authorized by statute.

The Commission's reliance on *Rural Telephone Coalition v. FCC*, 838 F.2d 1307 (D.C. Cir. 1988), fares no better. There we upheld the Commission's creation of a Universal Service Fund to provide subsidies for telephone service in rural and other high-cost areas. Again borrowing the language of section 1, we held that "[a]s the Universal Service Fund was proposed in order to further the objective of making communication service available to all Americans at reasonable charges, the proposal was within the Commission's statutory authority." *Id.* at 1315. Contrary to the Commission's argument, however, *Rural Telephone*, like *CCIA*, rested not on section 1 alone, but on the fact that creation of the Universal Service Fund was ancillary to the Commission's Title II responsibility to set reasonable interstate telephone rates. True, as the Commission observes, our discussion of ancillary authority never cites Title II. But any such citation would simply have restated the obvious given that the Commission established the Universal Service Fund for the very purpose of "'ensur[ing] that *telephone rates* are within the means of the average subscriber in all areas of the country.'" *Id.* at 1311–12 (emphasis added) (quoting *In re*

*Amend. of Pt. 67 of the Comm'n's Rules and Establishment of a Joint Bd.*, 96 F.C.C.2d 781, 795, ¶ 30 (1984)).

Next the Commission cites *New York State Commission on Cable Television v. FCC*, 749 F.2d 804 (D.C. Cir. 1984), in which we considered a challenge to a Commission order preempting state regulation of early satellite television. Because petitioner there never argued that the Commission's exercise of ancillary authority lacked sufficient grounding in express statutory authority, *New York State Commission* did not address the issue we now face. *See id.* at 808 (describing petitioner's challenge). Still, in sustaining the Commission's action, we noted that "[i]n its preemption order the Commission based its authority over [satellite television] upon the federal interest in 'the unfettered development of interstate transmission of satellite signals.'" *Id.* at 808 (quoting *In re Earth Satellite Commc'ns, Inc.*, 95 F.C.C.2d 1223, 1230, ¶ 16 (1983)). According to the Commission, this language demonstrates that ancillary authority may be grounded in policy alone. Not so. Our statement does nothing more than clearly and accurately describe what the Commission actually did, i.e., supply a policy justification for its decision. Significantly for the issue before us here, the Commission's preemption order also expressly linked its exercise of ancillary authority over satellite television to its Title III authority over users of radio spectrum. The Commission noted that the reception facilities that states sought to regulate (satellite dishes on hotel and apartment building roofs) "initially were subject to Commission licensing," calling these receivers "absolutely essential instrumentalities of radio broadcasting." *Earth Satellite Commc'ns*, 95 F.C.C.2d at 1231, ¶ 17 (internal quotation marks omitted). The Commission also cited section 303, which provides that "the Commission . . . as public convenience, interest, or necessity requires, shall . . .

[c]lassify radio stations; . . . [p]rescribe the nature of the service to be rendered by each class of licensed stations and each station within any class; . . . [a]ssign bands of frequencies to the various classes of stations," and so on. 47 U.S.C. § 303. These express delegations of authority contrast sharply with the general policies set forth in section 230(b) and section 1.

The Commission next relies on *National Ass'n of Regulatory Utility Commissioners v. FCC*, 880 F.2d 422 (D.C. Cir. 1989) (*NARUC III*), in which we considered a challenge to its decision to preempt state regulation of "inside wiring"—"telephone wires within a customer's home or place of business." *Id.* at 425. The Commission had found inside wiring to be beyond the scope of its Title II regulation and simultaneously preempted state regulation of such wiring. We held that the Commission had authority to issue the preemption orders insofar as necessary "to encourage competition in the provision, installation, and maintenance of inside wiring." *Id.* at 429–30. Although we did "agree with the FCC that this policy [was] consistent with the goals of the Act, and that it [had] the authority to implement this policy with respect to interstate communications," *id.* (citation omitted), petitioners in that case had conceded that "inside wiring installation and maintenance . . . are integral to *telephone communication*," *id.* at 427 (emphasis added)—a fact critical to the Commission's exercise of preemption authority. In its orders, the Commission had emphasized that "[o]ur prior preemption decisions have generally been limited to activities that are closely related to the provision of services and which affect the provision of interstate services." *In re Detariffing the Installation and Maintenance of Inside Wiring*, 1 F.C.C.R. 1190, 1192, ¶ 17 (1986). The term "services" referred to "common carrier communication services" within the scope of the Commission's Title II jurisdiction. *Id.* "In

short," the Commission explained, "the *interstate telephone network* will not function as efficiently as possible without the preemptive detariffing of inside wiring installation and maintenance." *Id.* (emphasis added). The Commission's preemption of state regulation of inside wiring was thus ancillary to its regulation of interstate phone service, precisely the kind of link to express delegated authority that is absent in this case.

The Commission cites several additional cases, but none support its expansive view of ancillary authority. Two decisions, like the many we have already discussed, upheld the Commission's exercise of ancillary authority because, unlike here, the Commission had linked its action to a statutory delegation of regulatory authority. *See United Video, Inc. v. FCC*, 890 F.2d 1173, 1182–83 (D.C. Cir. 1989) (upholding rules that, like those upheld in *Southwestern Cable*, limited the ability of cable companies to import programming into a broadcaster's market); *GTE Serv. Corp. v. FCC*, 474 F.2d 724, 729–30 (2d Cir. 1973) (upholding Commission regulation of "data processing activities of common carriers" based on the Commission's concern "that the statutory obligation of the communication common carrier to provide adequate and reasonable services could be adversely affected"). In another case, we rejected the Commission's argument, similar to the one it makes here, that it could exercise ancillary authority on the basis of policy alone. *Motion Picture Ass'n of Am. v. FCC*, 309 F.3d 796, 806–07 (D.C. Cir. 2002) (finding the Commission's "argument that [its] video description rules are obviously a valid communications policy goal and in the public interest" insufficient to justify its exercise of ancillary authority (internal quotation marks omitted)). And in two decisions, ancillary authority was either never addressed, *Nat'l Broad. Co. v. United States*, 319 U.S. 190 (1943) (reviewing the

Commission's exercise of its express licensing power over broadcasting stations under section 303, 47 U.S.C. § 303), or addressed only in passing, *AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 379–80 (1999) (mentioning the existence of the Commission's ancillary authority in the course of interpreting another provision of the Act).

**B.**

This brings us to the second category of statutory provisions the Commission relies on to support its exercise of ancillary authority. Unlike section 230(b) and section 1, each of these provisions could at least arguably be read to delegate regulatory authority to the Commission.

We begin with section 706 of the Telecommunications Act of 1996, which provides that "[t]he Commission . . . shall encourage the deployment on a reasonable and timely basis of advanced telecommunications capability to all Americans . . . by utilizing . . . price cap regulation, regulatory forbearance, measures that promote competition in the local telecommunications market, or other regulating methods that remove barriers to infrastructure investment." 47 U.S.C. § 1302(a). As the Commission points out, section 706 does contain a direct mandate—the Commission "shall encourage . . . ." In an earlier, still-binding order, however, the Commission ruled that section 706 "does not constitute an independent grant of authority." *In re Deployment of Wireline Servs. Offering Advanced Telecomms. Capability*, 13 F.C.C.R. 24,012, 24,047, ¶ 77 (1998) (*Wireline Deployment Order*). Instead, the Commission explained, section 706 "directs the Commission to use the authority granted in other provisions . . . to encourage the deployment of advanced services." *Id.* at 24,045, ¶ 69.

The Commission now insists that this language refers only "to whether section 706(a) supported *forbearance* authority," Resp't's Br. 41, i.e., the Commission's authority to free regulated entities from their statutory obligations in certain circumstances, *see* 47 U.S.C. § 160. According to the Commission, it "was not opining more generally on the effect of section 706 on ancillary authority." Resp't's Br. 41. But the order itself says otherwise: "[S]ection 706(a) does not constitute an independent grant of forbearance authority *or of authority to employ other regulating methods*." *Wireline Deployment Order*, 13 F.C.C.R. at 24,044, ¶ 69 (emphasis added). Because the Commission has never questioned, let alone overruled, that understanding of section 706, and because agencies "may not . . . depart from a prior policy *sub silentio*," *FCC v. Fox Television Stations, Inc.*, 129 S. Ct. 1800, 1811 (2009), the Commission remains bound by its earlier conclusion that section 706 grants no regulatory authority.

Implying that this court has done what the Commission has not, the Commission points to a recent decision in which we wrote, "The general and generous phrasing of § 706 means that the FCC possesses significant, albeit not unfettered, authority and discretion to settle on the best regulatory or deregulatory approach to broadband." *Ad Hoc Telecomms. Users Comm. v. FCC*, 572 F.3d 903, 906–07 (D.C. Cir. 2009). In that case, however, we cited section 706 merely to support the Commission's choice between regulatory approaches clearly within its statutory authority under other sections of the Act, and upheld the Commission's refusal to forbear from certain regulation of business broadband lines as neither arbitrary nor capricious. Nowhere did we question the Commission's determination that section 706 does not delegate any regulatory authority. The Commission's reliance on section 706 thus fails. As in the

case of section 230(b) and section 1, the Commission is seeking to use its ancillary authority to pursue a stand-alone policy objective, rather than to support its exercise of a specifically delegated power.

The Commission's attempt to tether its assertion of ancillary authority to section 256 of the Communications Act suffers from the same flaw. Section 256 directs the Commission to "establish procedures for . . . oversight of coordinated network planning . . . for the effective and efficient interconnection of public telecommunications networks." 47 U.S.C. § 256(b)(1). In language unmentioned by the Commission, however, section 256 goes on to state that "[n]othing in this section shall be construed as expanding . . . any authority that the Commission" otherwise has under law, *id.* § 256(c)—precisely what the Commission seeks to do here.

The Commission next cites section 257. Enacted as part of the Telecommunications Act of 1996, that provision gave the Commission fifteen months to "complete a proceeding for the purpose of identifying and eliminating, by regulations pursuant to its authority under this chapter (other than this section), market entry barriers for entrepreneurs and other small businesses in the provision and ownership of telecommunications services and information services." 47 U.S.C. § 257(a). Although the section 257 proceeding is now complete, that provision also directs the Commission to report to Congress every three years on any remaining barriers. *See In re § 257 Proceeding to Identify and Eliminate Mkt. Entry Barriers for Small Bus.*, 12 F.C.C.R. 16,802 (1997) (completing original proceeding); 47 U.S.C. § 257(c) (requiring ongoing reports). We readily accept that certain assertions of Commission authority could be "reasonably ancillary" to the Commission's statutory responsibility to

issue a report to Congress. For example, the Commission might impose disclosure requirements on regulated entities in order to gather data needed for such a report. But the Commission's attempt to dictate the operation of an otherwise unregulated service based on nothing more than its obligation to issue a report defies any plausible notion of "ancillariness." *See Motion Picture Ass'n of Am.*, 309 F.3d at 801–02 (holding that an order requiring that broadcasters incorporate "video descriptions" into certain television programs fell outside the Commission's ancillary authority even though it had been directed to produce a report on the subject).

Next the Commission argues that its exercise of authority over Comcast's network management practices is ancillary to its section 201 common carrier authority—though the section 201 argument the Commission sets forth in its brief is very different from the one appearing in the *Order*. As indicated above, section 201 provides that "[a]ll charges, practices, classifications, and regulations for and in connection with [common carrier] service shall be just and reasonable." 47 U.S.C. § 201(b). In the *Order*, the Commission found that by blocking certain traffic on Comcast's Internet service, the company had effectively shifted the burden of that traffic to other service providers, some of which were operating their Internet access services on a common carrier basis subject to Title II. *Order*, 23 F.C.C.R. at 13,037–38, ¶ 17. By marginally increasing the variable costs of those providers, the Commission maintained, Comcast's blocking of peer-to-peer transmissions affected common carrier rates. *Id.* Whatever the merits of this position, the Commission has forfeited it by failing to advance it here. *See United States ex rel. Totten v. Bombardier Corp.*, 380 F.3d 488, 497 (D.C. Cir. 2004) ("Ordinarily, arguments that parties do not make on appeal are deemed to have been waived.").

Instead, the Commission now argues that voice over Internet Protocol (VoIP) services—in essence, telephone services using Internet technology—affect the prices and practices of traditional telephony common carriers subject to section 201 regulation. According to the Commission, some VoIP services were disrupted by Comcast's network management practices. We have no need to examine this claim, however, for the Commission must defend its action on the same grounds advanced in the *Order*. *SEC v. Chenery Corp.*, 318 U.S. 80, 87–88 (1943).

The same problem undercuts the Commission's effort to link its regulation of Comcast's network management practices to its Title III authority over broadcasting. The Commission contends that Internet video "has the potential to affect the broadcast industry" by influencing "local origination of programming, diversity of viewpoints, and the desirability of providing service in certain markets." Resp't's Br. 43. But the Commission cites no source for this argument in the *Order*, nor can we find one.

Finally, the Commission argues that the *Order* is ancillary to its section 623 authority over cable rates. 47 U.S.C. § 543. Although the *Order* never mentions section 623, and although, as far as we can tell, no commenter suggested section 623 as a basis for the Commission's exercise of ancillary authority, the Commission argues that its reliance on this provision is implicit in its section 1 finding. That finding included the following explanation:

> [E]xercising jurisdiction over the complaint would promote [section 1's] goal of achieving "reasonable charges." For example, if cable companies such as Comcast are barred from inhibiting consumer access to high-definition on-line video content, then, as

> discussed above, consumers with cable modem service will have available a source of video programming (much of it free) that could rapidly become an alternative to cable television. The competition provided by this alternative should result in downward pressure on cable television prices, which have increased rapidly in recent years.

*Order*, 23 F.C.C.R. at 13,037, ¶ 16. Laying the foundation for this theory earlier in the *Order*, the Commission found that "video distribution poses a particular competitive threat to Comcast's video-on-demand ('VOD') service. VOD operates much like online video, where Internet users can select and download or stream any available program without a schedule and watch it any time . . . ." *Id.* at 13,030, ¶ 5 (internal quotation marks and alteration omitted).

The Commission's argument that we should read its invocation of section 1 as a reference to its section 623 authority over cable rates fails because, unlike its Title II authority over common carrier rates, its section 623 authority is sharply limited. Indeed, section 623 expressly prohibits the Commission from regulating rates for "video programming offered on a . . . per program basis," i.e., video-on-demand service. 47 U.S.C. § 543(*l*)(2), (a)(1). Although the Commission once enjoyed broader authority over cable rates, *see id.* § 543(c)(4), its current authority is limited to setting standards for and overseeing local regulation of rates for "basic tier" service on certain cable systems. *See id.* § 543(b). In the *Order*, the Commission does not assert ancillary authority based on this narrow grant of regulatory power. Instead, the *Order* rests on the premise that section 1 gives the Commission ancillary authority to ensure reasonable rates for *all* communication services, including those, like video-on-demand, over which it has no express regulatory authority.

As explained above, *Southwestern Cable*, *Midwest Video I*, *Midwest Video II*, and *NARUC II* bar this expansive theory of ancillary authority.

**V.**

It is true that "Congress gave the [Commission] broad and adaptable jurisdiction so that it can keep pace with rapidly evolving communications technologies." Resp't's Br. 19. It is also true that "[t]he Internet is such a technology," *id.*, indeed, "arguably the most important innovation in communications in a generation," *id.* at 30. Yet notwithstanding the "difficult regulatory problem of rapid technological change" posed by the communications industry, "the allowance of wide latitude in the exercise of delegated powers is not the equivalent of untrammeled freedom to regulate activities over which the statute fails to confer . . . Commission authority." *NARUC II*, 533 F.2d at 618 (internal quotation marks and footnote omitted). Because the Commission has failed to tie its assertion of ancillary authority over Comcast's Internet service to any "statutorily mandated responsibility," *Am. Library*, 406 F.3d at 692, we grant the petition for review and vacate the *Order*.

*So ordered.*