SILBERMAN, Senior Circuit Judge,
concurring in part and dissenting in part:
I am in general agreement with the majority’s conclusion that the Open Internet Order impermissibly subjects broadband providers to treatment as common carriers, but I disagree with the majority’s conclusion that § 706 otherwise provides the FCC with affirmative statutory authority to promulgate these rules. I also think the Commission’s reasoning violates the Administrative Procedure Act. These differences are important since the majority opinion suggests possible regulatory modifications that might circumvent the prohibition against common carrier treatment.
I.
The Commission’s net neutrality regulation is purportedly designed to promote innovation among edge providers who, in turn, provide Internet user experience, thereby increasing user demand for broadband service and, ultimately, encouraging broadband providers to invest in infrastructure development to meet that demand. Open Internet Order, 25 F.C.C.R. 17905, 17907 ¶ 13 (2010). Verizon describe this theory as a “triple cushion shot.” As I will show, whatever its logic, it is based *660 on a faulty factual premise. But my first disagreement with the Commission, and the majority, is to the claimed statutory authority.
I quite agree with the majority that the relevant statutory language is § 706 of the Communications Act. 47 U.S.C. § 1302. Although the FCC purports to rely on a scatter shot of other provisions of the statute, as well as § 706, none of those other provisions truly bear on the issue. “Emanations from the penumbra” may once have served to justify constitutional interpretation, but it hasn’t caught on as legitimate statutory interpretation. I also agree with the majority — and disagree with Verizon — that § 706 is a grant of positive regulatory authority, but it doesn’t come close to sanctioning the Commission’s regulation.
The statute directs the Commission to “encourage the deployment on a reasonable and timely basis of advanced telecommunications capability to all Americans ... by utilizing ... price cap regulation, regulatory forbearance, measures that promote competition in the local telecommunications market, or other regulating methods that remove barriers to infrastructure investment.” 47 U.S.C. § 1302(a).[1]
The FCC contends for, and the majority grants, Chevron deference as to the interpretation of this language. I don’t disagree that Chevron is called for, but Chevron “is not a wand by which courts can turn an unlawful frog into a legitimate prince.” Associated Gas Distributors v. F.E.R.C., 824 F.2d 981, 1001 (D.C.Cir.1987).
The key words obviously are “measures that promote competition in the local telecommunications market or other regulating methods that remove barriers to infrastructure investment.” Those are the words that grant actual authority. Yet the Commission does not ground its regulation on this language. Indeed, both the Commission and the majority conflate these two clauses, though they have distinct functions. “Promoting competition in the telecommunications market” implies a regulation that encourages broadband providers to compete with each other, head-to-head, on price and quality. Removing “barriers to infrastructure investment,” on the other hand, does not necessarily require any increased competition in the telecommunications market.[2] For example, if a particular broadband provider were a monopolist, then by regulating its prices, the Commission might encourage it to expand supply to increase profits, rather than artificially restrict supply so as to charge supracompetitive rates. Such a regulation would not increase competition, but it would at least potentially remove a barrier to investment. This is, essentially, the theory that the Commission purportedly relies on: If the Commission theoretically could spur demand for broadband, the Commission would encourage further infrastructure investment regardless of head-to-head competition. Thus, it is on the “removing barriers” clause, primarily,[3] *661 that the Order must stand or fall. Yet, the Commission never actually identifies any practices of the broadband providers as “barriers to investment” — not once in over 100 pages — probably because it would be so far fetched an interpretation of those words.
Nor does the Commission state (or argue in its brief), contrary to the majority’s opinion, that the “triple cushion shot” — the means by which the Commission hopes to stimulate demand for better broadband— is designed to increase competition in the broadband market. See Majority Op. at 642 — 43 (citing 25 F.C.C.R. at 17910-11, 17970 ¶¶ 14, 120). Paragraph 14 makes no reference to competition,[4] and paragraph 120 does not refer to competition between broadband providers in the local telecommunications market — which is the statutory objective. Indeed, paragraph 120 indicates that the Commission’s objective is to protect the edge providers (not in the telecommunications market) from content competition with the broadband providers.[5]
Indeed, the Commission frankly admits its purpose is much wider than the statutory objectives. It claims it must regulate broadly, so as to “proteet[ ] consumer choice, free expression, end-user control, and the ability to innovate without permission,” 25 F.C.C.R. at 17949 ¶78, which *662 certainly indicates a Commission objective that exceeds the statutory authority granted in § 706.
The majority takes the statutory language even further; it states that the Commission’s
authority to promulgate regulations that promote broadband deployment encompasses the power to regulate broadband providers’ economic relationships with edge providers if, in fact, the nature of those relationships influences the rate and extent to which broadband providers develop and expand services for end users.
Majority Op. at 643. So much for the terms “promote competition in the local telecommunications market” or “remove barriers to infrastructure investment.” Presto, we have a new statute granting the FCC virtually unlimited power to regulate the Internet. This reading of § 706, as we said in Comcast Corp. v. FCC, “would virtually free the Commission from its congressional tether.” 600 F.3d 642, 655 (D.C.Cir.2010). The limiting principles the majority relies on are illusory.
The majority claims that the Commission cannot exceed its subject-matter jurisdiction over “interstate and foreign communication by wire and radio.” 25 F.C.C.R. at 17970 ¶ 121 (citing 47 U.S.C. § 152(a)). This is obviously true, but it is not a limitation on the Commission’s interpretation of this specific statutory provision. The question is not whether the statute permits the Commission to do absolutely anything — of course it does not— but, rather, whether § 706 contains any intrinsic limitations. If the Commission’s subject matter jurisdiction is a “limiting principle,” then we might as well call the First Amendment a limiting principle, for surely the Commission could not censor the Internet, even if doing so did somehow increase broadband deployment.
According to the majority, the Commission is also restrained because it may only regulate pursuant to § 706 if it does so to achieve a particular purpose: to “encourage the deployment on a reasonable and timely basis of advanced telecommunications capability to all Americans.” 25 F.C.C.R. at 17970 ¶ 121 (citing 47 U.S.C. § 1302(a)). This is an almost meaningless limitation, as demonstrated by the Open Internet Order itself. The Commission’s theory is that an open Internet will spur demand for broadband infrastructure. Id. at 17907 ¶ 3. But any regulation that, in the FCC’s judgment might arguably make the Internet “better,” could increase demand. I do not see how this “limitation” prevents § 706 from being carte blanche to issue any regulation that the Commission might believe to be in the public interest.
To sum up, § 706 requires the Commission to identify a “barrier[ ] to infrastructure investment” or a measure that “promoted competition” in the broadband market — which it has not.
II.
Verizon alternatively argue that, even assuming that § 706 grants the Commission its claimed authority, the regulation is arbitrary and capricious because its findings — such as they are — lack substantial evidence. I agree. Although we are not faced with a formal adjudication which would be judged by substantial evidence on a closed record, factual determinations that underly regulations must still be premised on demonstrated — and reasonable — evidential support. See Motor Vehicle Mfrs. Ass’n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983).
The Commission purports to fear that broadband providers might discriminate against, or even block, the Internet traffic *663 of specific edge providers or classes of edge providers, perhaps because broadband providers offer some competing services or because they might charge certain edge providers for premium services. The majority puts it even more starkly, asserting that the Commission “found that broadband providers have the technical and economic ability to impose restrictions on edge providers.” Majority Op. at 646 (emphasis added). But the Commission never actually made such a finding. Its conclusions are littered with “may,” “if,” and “might.” For example, according to the Commission, a broadband provider:
• “may have economic incentives to block or otherwise disadvantage specific edge providers”
• “might use this power to benefit its own or affiliated offerings at the expense of unaffiliated offerings”
• “may act to benefit edge providers that have paid it to exclude rivals”
• “may have incentives to increase revenues by charging edge providers”[6]
• “might withhold or decline to expand capacity in order to ‘squeeze’ non-prioritized traffic”
25 F.C.C.R. at 17915-22 ¶¶ 21-29. To be sure, the majority correctly observes that we should defer to an agency’s “predictive judgments as to the economic effect of a rule,” National Telephone Cooperative Ass’n v. FCC, 563 F.3d 536, 541 (D.C.Cir.2009), but deference to such a judgment must be based on some logic and evidence, not sheer speculation. That a party “may” do something is hardly a finding — at least in American law — that a party has done or will do something. Moreover, whether or not the “triple cushion shot” theory is rational economics (and I have my doubts), it rests, as I have noted, on a false factual premise — that the evidence supports a finding that broadband providers across the board, in all markets, enjoy sufficient, economic clout to take the above actions.
The Commission asserts — and the majority accepts — that broadband providers act as “gatekeepers” because each one has a so-called “terminating monopoly” over access to particular end users. These are terms, largely invented,[7] the economic significance of which the Commission does not explain. All retail stores, for instance, are “gatekeepers.” The term is thus meaningful only insofar as the gatekeeper by means of a powerful economic position vis-a-vis consumers gains leverage over *664 suppliers.[8] The Commission made no effort to construct an analytic framework to measure this supposed gateway advantage — it is a rather slippery concept — nor did it adduce evidence to establish the economic power it would supposedly afford all broadband providers against all edge providers.
Without broadband provider market power, consumers, of course, have options; they can go to another broadband provider if they want to reach particular edge providers or if their connections to particular edge providers have been degraded. The Commission implicitly recognizes this, because it justifies exempting dial-up Internet providers from the Order by noting that “telephone service has historically provided the easy ability to switch among competing dial-up Internet access services.” 25 F.C.C.R. at 17935 ¶51. The Commission also exempts “backbone” Internet providers — which interconnect between broadband providers — obviously for the same reason. On the other hand, the Commission asserts that broadband customers may have few alternatives or they may be locked into long-term contracts with early-termination fees. To be sure, some difficulty switching broadband providers is certainly a factor that might contribute to a firm’s having market power, but that itself is not market power. There are many industries in which switching between competitors is not instantly achieved, but those industries may still be heavily disciplined by competitive forces because consumers will switch unless there are real barriers. By pointing to potential difficulties consumers may encounter switching broadband providers, the Commission is simply implying that broadband providers have market power (market power lite?), without actually examining if and where they do.
Although Verizon was reluctant to concede that even if a broadband provider had market power that would authorize the Commission to take action under § 706— presumably because they challenged any regulatory authority under § 706 — they did bring to our attention a Justice Department submission, discussed infra, that emphasized the necessity of the Commission limiting its regulatory initiatives to the control of broadband market power. Ex Parte Submission of the U.S. DOJ at 28, Docket No. 09-51 (Jan. 4, 2010). My discussion of market power reflects my view (and apparently the Justice Department’s) of what evidence would be adequate to support the Commission’s rule. In any event, Verizon certainly challenged the factual basis of the Commission’s “gateway” conclusion, so I don’t think the existence vel non of market power is really a different consideration. See Majority Op. at 647-48.
The majority does contend that four possible instances of broadband providers restricting users’ access to certain edge providers are sufficient evidence of broadband providers’ “incentives and ability to restrict Internet traffic.” Majority Op. at 649. That the Commission was able to *665 locate only four potential examples of such conduct is, frankly, astonishing. In such a large industry where, as Verizon notes, billions of connections are formed between users and edge providers each year, one would think there should be ample examples of just about any type of conduct. But even if examples of such conduct were more numerous, it would still not be evidence that broadband providers are economically capable of restricting consumer choice. And, as the Commission noted, there are potentially efficient, pro-consumer reasons that an individual broadband provider might wish to restrict access to some edge providers. See 25 F.C.C.R. at 17921 ¶28 n. 80 (“Economics literature recognizes that access charges could be harmful under some circumstances and beneficial under others.... [T]he economic literature on two-sided markets is at an early stage of development.”). The Commission’s anecdotes then do not show that any broadband providers are capable of actually causing the harm about which the Commission is concerned.
My view, then, is that the Commission’s failure to conduct a market power analysis is fatal to its attempt to regulate, because it means that there is inadequate evidence to support the lynchpin of the Commission’s economic theory. The Commission actually recognized that a finding of market power would enhance its theory. 25 F.C.C.R. at 17923 ¶ 32. Indeed! But such a finding would, of course, have to be made market to market (indeed the statute specifically references local telecommunications markets), and if so, it would be a finding of a barrier to broadband investment without the mental gymnastics of the triple cushion shot. If one (or two) broadband providers have market power in any particular market and thereby could raise prices while restricting supply, the Commission could well conclude that was a barrier to broadband investment.
: Of course, before the Commission could determine whether a particular broadband provider possesses market power, it would have to first define the relevant market. Instead, the Commission, in this case, simply cited a 2009 study that found that “nearly 70 percent of households lived in census tracts where only one or two wire-line or fixed wireless firms provided advertised download speeds of at least 3 Mbps and upload speeds of at least 768 Kbps.” 25 F.C.C.R. at 17923 ¶ 32. Why are these speeds relevant? Because the Commission has previously, as part of its statutory duty to assess the state of broadband deployment, defined “broadband” to mean download speeds of at least 4 Mbps and upload speeds of at least 1 Mbps. Sixth Broadband Deployment, Report, 25 F.C.C.R. 9556, 9559 ¶ 5 (2010). According to the Commission, it is the minimum speed necessary to stream high quality video while simultaneously browsing the Internet and using email. Id. I don’t dispute the legitimacy of that definition. Yet, while the Commission is free to rely on technical considerations in defining the statutory term “broadband,” such considerations are irrelevant when it comes to defining the market in economic terms. A broadband provider offering a 2 Mbps connection is not, according to the FCC, really offering broadband. But it is quite likely that consumers, in deciding which Internet service to purchase, will compare products at varying speeds and price points. Slower service providers can still exert competitive pressure on faster service providers. So, too, can mobile broadband providers. Before the Commission can conclude that a market is concentrated, it must first define that market. It has made no effort to do so.
The Commission, moreover, does not address whether the trend in the broadband market is towards more or less competí *666 tion. Obviously the deployment of broadband infrastructure is a capital-intensive process, and it should not be surprising if, during a period of expansion, some areas are served by fewer competitors than others. But there is no evidence in the record suggesting that broadband providers are carving up territory or avoiding head-to-head competition. At least anecdotally, the opposite seems to be true. Google has now entered the broadband market as a direct competitor:
Google’s ultra-high-speed Internet service may finally be scaring the big Internet providers into action. Following Google’s announcement that it will expand into Austin, Texas, AT & T announced it will offer fiber Internet in the city, and Time Warner Cable announced it would offer citywide wireless Internet service.
But smaller companies are also trying to head off Google before the company even makes an announcement in their communities. This week, for example, the Lawrence, Kansas-based Internet provider Wicked Broadband began taking pre-orders for a residential fiber Internet service with speeds to rival Google Fiber’s.
Klint Finley, Google Fiber Spurs Monu- and-Pop Net Providers Too, Wired, Apr. 26, 2013, http://www.wired.com/wired enterprise/2013/04/google-fiberwicked/.
The Commission apparently wanted to avoid a disciplined inquiry focused on market power, notwithstanding the warning it received from the Justice Department less than a year before the regulation issued— which, as I noted, Verizon cited — a warning that unless the FCC’s focus was on market power, any regulation could actually discourage broadband development, thus frustrating the statutory objective:
Although enacting some form of regulation to prevent certain providers from exercising monopoly power may be tempting with regard to ... areas [served by only one or two broadband providers], care must be taken to avoid stifling the infrastructure investments needed to expand broadband access. In particular, price regulation would be appropriate only where necessary to protect consumers from the exercise of monopoly power and where such regulation would not stifle incentives to invest in infrastructure deployment.
Ex Parte Submission of the. U.S. DOJ at 28, Docket No. 09-51 (Jan. 4, 2010).
The Commission did postulate one other economic theory supposedly establishing a “barrier to infrastructure investment” that does not depend on the broadband providers possessing market power. It argued, essentially, that innovation among edge providers is a public good in that every broadband provider benefits from an open Internet, but each broadband provider has an individual incentive to charge edge providers for service because, if broadband providers were to forego that revenue stream, they would be unable to internalize all of the supposed benefits to innovation. 25 F.C.C.R. at 17919 ¶25. In short, the Commission speculates that the Open Internet Order prevents a classic “tragedy of the commons” — a situation in which each economic actor, behaving in his own self-interest, contributes to the destruction of a public good. See Garrett Hardin, The Tragedy of the Commons, 162 Science 1243 (1968). In such a situation, each actor would be better off if a central regulator prevented them from doing what would be in their private interest if they were acting unilaterally. Again, however, the Commission fails to make any real economic findings regarding whether these rules are actually necessary to prevent *667 such a situation. As such, it is the sheerest of fanciful speculation.
Indeed, if a tragedy of the commons were likely in the broadband market, then one would expect Verizon and other broadband providers to support the Open Internet Order, because such a situation would be economically harmful to them in the long run. By the same token, when firms oppose, on antitrust grounds, the merger of competing firms, it is generally a reliable indicator that the merger is pro-competitive. See Frank H. Easterbrook, The Limits of Antitrust, 63 Tex. L.Rev. 1, 18 (1984) (“When a business rival brings suit, it is often safe to infer that the arrangement is beneficial to consumers.”). Firms can generally be relied upon to know their own best interest.
Perhaps most troubling, the Commission fails to appreciate the long-term impact of its own regulations. An unwarranted government interference in a functioning market is likely to persist indefinitely, whereas a failure to intervene, even when regulation would be helpful, is likely to be only temporarily harmful because new innovations are constantly undermining entrenched industrial powers. See id. at 3 (“[Jjudicial errors that tolerate baleful practices are self-correcting while erroneous condemnations are not.”); Tim Wu, The Master Switch 11 (2010) (“But as we have said, that which is centralized also eventually becomes a target for assault[.]”).
Nevertheless, the Commission justifies its aggressive, prophylactic regulation by asserting that the negative consequences of regulation (preserving the status quo) are likely to be minor, while the consequences of allowing the broadband market to evolve without regulation could be drastic and permanent. 25 F.C.C.R. at 17909 ¶ 12. I think this is quite wrong, but in any event, the agency’s judgment about the propriety of leaping before looking cannot displace the judgment of Congress which, in enacting § 706, did not so broadly empower the Commission. Rather, Congress required the agency to identify an actual barrier to infrastructure investment or a threat to competition, and the agency must have evidence that the barrier or threat exists.
III.
Because the Open Internet Order obviously imposes common carrier obligations on broadband providers, I join generally the opinion of the Court with respect to Part III. Indeed, even noted proponents of “net neutrality” acknowledge as much: “[N]et neutrality is the twenty-first century’s version of common carriage.... In the case of the Internet, common carriage under the name of net neutrality amounts to an FCC rule that bans any degree of blocking individual sites, [or] transmission of data.” Tim Wu, The Master Switch 236 (2010).
I have, however, one quibble with the majority’s analysis of the anti-blocking rules. Although ultimately concluding that the anti-blocking rules are unlawful, the majority says that whether those rules “likewise establish per se common carrier obligations is somewhat less clear.” Majority Op. at 657. Although the Order states that, under the anti-blocking rules, broadband providers may not degrade content so as to make it “effectively unusable,” the majority supposes that a broadband provider might voluntarily choose to offer service that is faster than the anti-blocking rules require, i.e., faster than the minimum speed necessary to make each edge provider effectively usable by consumers. By exceeding the minimum level of service, the majority suggests, the broadband providers would have wide latitude to engage in individualized bargain *668 ing, which might take this rule outside of common carriage per se. My concern with this hypothesis is that the phrase “effectively unusable” is subject to manipulation. I think it should mean that whatever speed is generally offered to most edge providers is the minimum necessary to be effectively usable. After all, it is artificial to distinguish between what is “effective” and what consumers expect. If a faster speed were to become standard, we would likely consider a slower speed to be effectively unusable. Thus, while there is a possibility that a “fast lane” Internet service might be offered on a non-common carriage, basis, the service that most users receive under this rule would still have to be offered as common carriage, at a regulated price of zero. In any event, as the majority recognizes, the Commission did not make this argument, so the anti-blocking rules must fall.[9]
This regulation essentially provides an economic preference to a politically powerful constituency, a constituency that, as is true of typical rent seekers, wishes protection against market forces. The Commission does not have authority to grant such a favor.

. Because § 706(b) contains almost the same language, it is unnecessary to discuss these two provisions separately. See 47 U.S.C. § 1302(b) (The Commission "shall take immediate action ... by removing barriers to infrastructure investment and by promoting competition in the telecommunications market.”).

. An example of a paradigmatic barrier to infrastructure investment would be state laws that prohibit municipalities from creating their own broadband infrastructure to compete against private companies. See Klint Finley, Why Your City Should Compete With Google’s Super-Speed Internet, Wired, May 28, 2013, http://www.wired.com/wiredenterprise/ 2013/05/community-fiber/.

.The transparency rules at least have the added benefit of facilitating consumer choice by providing information, which could lead to greater competition in the broadband market.

. The Internet’s openness is critical to these outcomes, because it enables a virtuous circle of innovation in which new uses of the network — including new content, applications, services, and devices — lead to increased end-user demand for broadband, which drives network improvements, which in turn lead to further innovative network uses. Novel, improved, or lower-cost offerings introduced by content, application, service, and device providers spur end-user demand and encourage broadband providers to expand their networks and invest in new broadband technologies. Streaming video and e-commerce applications, for instance, have led to major network improvements such as fiber to the premises, VDSL, and DOCSIS 3.0. These network improvements generate new opportunities for edge providers, spurring them to innovate further.. Each round of innovation increases the value of the Internet for broadband providers, edge providers, online businesses, and consumers. Continued operation of this virtuous circle, however, depends upon low barriers to innovation and entry by edge providers, which drive end-user demand. Restricting edge providers’ ability to reach end users, and limiting end users’ ability to choose which edge providers to patronize, would reduce the rate of innovation at the edge and, in turn, the likely rate of improvements to network infrastructure. Similarly, restricting the ability of broadband providers to put the network to innovative uses may reduce the rate of improvements to network infrastructure.
25- F.C.C.R. at 17910-11 ¶ 14.

. In directing the Commission to "encourage the deployment on a reasonable and timely basis of advanced telecommunications capability to all Americans ... by utilizing ... price cap regulation, regulatory forbearance, measures that promote competition in the local telecommunications market, or other regulating methods that remove barriers to infrastructure investment," Congress necessarily invested the Commission with the statutory authority to carry out those acts. Indeed, the relevant Senate Report explained that the ’ provisions of Section 706 are "intended to ensure that one of the primary objectives of the [1996 Act] — to accelerate deployment of advanced telecommunications capability — is achieved,” and stressed that these provisions are “a necessary fail-safe” to guarantee that Congress’s objective is reached. It would be odd indeed to characterize Section 706(a) as a "fail-safe” that "ensures” the Commission’s ability to promote advanced services if it conferred no actual authority. Here, under our reading, Section 706(a) authorizes the Commission to address practices, such as blocking VoIP communications, degrading or raising the cost of online video, or denying end users material information about their broadband service, that have the potential to stifle overall investment in Internet infrastructure and limit competition in telecommunications markets.
25 F.C.C.R. at 17970 ¶ 120 (emphasis added).

. In this case, Verizon has indicated it does wish to explore two-sided pricing (charging both edge providers and consumers).

. My research has not revealed any use of the phrase “terminating monopoly” outside of the context of these proceedings before the FCC. It does not appear to be an accepted economic term. A "gatekeeper,” on the other hand, is an intermediary between a consumer and an upstream seller. And a consumer’s willingness to switch to another available supplier depends on the prospective benefit measured against the transaction costs (how many blocks am I willing to walk, or how many phone calls am I willing to make?).
Recent literature suggests that gatekeepers may sometimes exercise market power against upstream suppliers even when the gatekeeper does not have enough market share to exercise downstream market power against consumers. See, e.g., Grimes, Warren S., Buyer Power and Retail Gatekeeper Power: Protecting Competition and the Atomistic Seller, 72 Antitrust L.J. 563, 580 (2005). One example would be if I purchase my groceries at a particular store, any food supplier who wishes to sell to me probably must do so through that particular store because I am unlikely to switch grocery stores over a single product. Regardless of any contemporary debates over the differences between buyer power and seller power, one thing is clear: The gatekeeper effect is a tool that facilitates the exercise of market power over sellers; it is not market power itself.

. The Commission treats each individual edge provider as analogous to an upstream seller in a retail context. But it seems more plausible that consumers consider "Internet access” to be the product that they are buying, and that large product creates greater incentives to switch to another provider. Although the Commission has argued that consumers will perceive a slow connection to a particular edge provider as indicative of a problem with that edge provider, rather than as a problem with the quality of Internet access provided by the broadband provider, 25 F.C.C.R. at 17921 ¶27, the Commission presents no evidence to support that conclusion. Indeed, edge providers have a strong incentive to inform consumers if their connections are being degraded. Moreover, the transparency rule, which we uphold, makes this outcome almost impossible.

. I do think that the transparency rules rest on firmer ground. The Commission is required to make triennial reports to Congress on "market entry barriers" in information services, 47 U.S.C. § 257, and requiring disclosure of network management practices appears to be reasonably ancillary to that duty. I also agree with the majority's conclusion that the disclosure rules are severable from the anti-discrimination and anti-blocking rules.